**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE ARK INITIATIVE,<br>7 East North Street,<br>Pinedale, WY 82941,<br><br>DONALD DUERR,<br>7 East North Street,<br>Pinedale, WY 82941,<br><br>SCOTT SCHLESINGER,<br>1212 Southeast Third Avenue,<br>Fort Lauderdale, FL 33316,<br><br>　　　Plaintiffs,<br><br>　　　　　　v.<br><br>THOMAS TIDWELL, CHIEF,<br>U.S. Forest Service,<br>1400 Independence Avenue SW,<br>Washington, DC  20250,<br><br>SCOTT FITZWILLIAMS, SUPERVISOR,<br>White River National Forest,<br>U.S. Forest Service,<br>120 Midland Avenue, Suite 140,<br>Glenwood Springs, CO 81601,<br><br>MARIBETH GUSTAFSON, DEPUTY<br>REGIONAL FORESTER,<br>U.S. Forest Service,<br>Rocky Mountain Region,<br>740 Simms Street,<br>Golden, CO  80401,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　　Civ. No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

　　1.　　Plaintiffs The Ark Initiative, Donald Duerr, and Scott Schlesinger ("Plaintiffs")

bring this case for declaratory and injunctive relief pursuant to the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 500-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§§ 4321-4370f, challenging the U.S. Forest Service's ("Service" or "USFS") September 27, 2013

decision authorizing the construction of a long, wide, and partially clearcut skier egress trail that

will be groomed by motorized vehicles – and thus is tantamount to a road, *see* 36 C.F.R. §

294.21 (generally defining a "road" as "a motor vehicle route over 50 inches wide") – in a

formerly designated roadless area on Burnt Mountain in Colorado's White River National Forest.

2.      In May 2006, Plaintiffs prevailed in an administrative appeal that enjoined

construction of an egress trail in this parcel because the Service had failed to analyze and

disclose how this activity would impact the roadless qualities on Burnt Mountain.  According to

the Service's own meeting notes, a few weeks later a trade association representing Colorado ski

resorts "urge[d] the [Colorado Roadless Areas Review] Task Force and the Governor to

recommend removal from roadless inventory areas that are allocated in Forest Plans to ski area

special uses."  Such acres included the roadless parcel on Burnt Mountain where the egress trail

was enjoined pending further analysis and 8,180 acres that fall within lands associated with

commercial ski areas.  The Service then initiated rulemaking upon receiving a petition from the

State of Colorado incorporating the trade organization's request, but never notified Plaintiffs that

the rulemaking could adversely affect their interests or invited them to comment on the proposed

rule.  In July 2012, the Service finalized the landscape-level rule, known as the Colorado

Roadless Rule ("CRR"), and purported in the CRR and associated roadless inventory maps to

remove this 80-acre parcel (and 8,180 other roadless acres) from the roadless inventory on the

basis that these lands consist of degraded roadless area characteristics due to their proximity to

an operational ski resort.  The CRR, as a landscape-level regulation, did not undertake any site-

specific analysis of whether the blanket assumption proffered in the CRR in fact applies to this 80-acre parcel or any other parcel removed from the roadless inventory.

3.      Because, in rendering the challenged egress trail decision, the Service relied on and specifically applied the CRR – which arbitrarily removed 8,260 acres within Colorado ski area special use permit boundaries from the Service's roadless inventory and associated maps – Plaintiffs are also challenging the legality of that aspect of the CRR as exceeding the Service's statutory authority and as constituting arbitrary and capricious decisionmaking. Additionally, because the Service has proffered a new rationale justifying the removal of this and other parcels from the roadless inventory that was not articulated in the CRR itself, Plaintiffs challenge the legality of this newly explicated rationale as arbitrary, capricious, and contrary to governing law.

4.      Taken together, these agency actions are harming and degrading a unique natural area that as a factual matter is unroaded, and which is of enormous value to Plaintiffs and other members of the public. Because the USFS actions at issue are arbitrary, capricious, and contrary to law – including because the decision allowing the construction of the skier egress trail was issued in violation of NEPA – they should be set aside and remanded to the Service.

## JURISDICTION

5.      This Court has jurisdiction over this action and venue is proper in this district under 28 U.S.C. § 1331, 28 U.S.C. § 1391(e), and 5 U.S.C. § 703.

## PARTIES

6.      Plaintiff The Ark Initiative is a charitable nonprofit public interest organization dedicated to saving Earth's species and the habitat used by those species. The Ark Initiative uses three primary approaches to achieve its mission: (1) working to educate the public and government officials about the importance of protecting wild places and biological diversity, (2)

3

using civil and lawful advocacy methods to encourage actions that better protect native species and their habitats, and (3) serving as a think-tank to develop novel strategies for conserving wildlife.  Over the past decade, The Ark Initiative has worked to protect the Burnt Mountain environment adjacent to the Snowmass Ski Area, including the parcel that is the subject of this lawsuit, which is regularly used and enjoyed by The Ark Initiative's supporters, staff members, and board members for recreation, photography, hiking, wildlife viewing, solitude, and related activities.  The organization has submitted numerous comments and administrative appeals seeking to maintain the roadless qualities of Burnt Mountain.

7.      Plaintiff Donald Duerr is an environmental consultant, and serves as the Director and President of TAI.  For twenty-five years, Mr. Duerr has participated in NEPA decisionmaking processes for many National Forest management activities in the Rocky Mountain region, including on the White River National Forest in Colorado, and the Snowmass Ski Area in particular.  Mr. Duerr has regularly visited the White River National Forest and hiked in various roadless lands near Snowmass and Aspen, Colorado, including Burnt Mountain where the egress trail is to be located.  He uses and enjoys the public lands and natural resources of the White River National Forest, including Burnt Mountain and the lands in and around the Snowmass Ski Area, for many recreational, scientific, spiritual, educational, aesthetic, and other purposes.  Mr. Duerr enjoys hiking, birdwatching, looking for wildlife, contemplation, photography, and other activities in and around the public lands on the White River National Forest, including Burnt Mountain.  He plans to routinely return to the White River National Forest, including to the parcel on Burnt Mountain where the egress trail is to be located, to engage in the recreational and other activities described herein.  Mr. Duerr's recreational and other enjoyment of this parcel will be seriously impaired and diminished by egress trail

construction, tree cutting, and glading associated with egress trail construction, and the potentially permanent loss of roadless and wilderness-like characteristics in this parcel.  Mr. Duerr has submitted numerous comments and administrative appeals seeking to maintain the roadless qualities of Burnt Mountain.

8.     Plaintiff Scott Schlesinger is an avid outdoorsman, and for several decades has regularly visited the White River National Forest, including Burnt Mountain where the egress trail is to be located.  He uses and enjoys the public lands and natural resources of the White River National Forest, including Burnt Mountain and the lands in and around the Snowmass Ski Area, for many recreational, scientific, spiritual, educational, aesthetic, and other purposes.  In particular, Mr. Schlesinger enjoys backcountry skiing, hiking, solitude, and other activities in and around the public lands on the White River National Forest, including on Burnt Mountain. He plans to routinely return to the White River National Forest, including to the parcel on Burnt Mountain where the egress trail is to be located, to engage in the recreational and other activities described herein.  Mr. Schlesinger's recreational and other enjoyment of this parcel will be seriously impaired and diminished by egress trail construction, tree cutting, and glading associated with egress trail construction, and the potentially permanent loss of roadless and wilderness-like characteristics in this parcel.  Mr. Schlesinger has submitted numerous comments and administrative appeals seeking to maintain the roadless qualities of Burnt Mountain.

9.     Defendant Thomas Tidwell is the Chief of the United States Forest Service, which is an agency or instrumentality of the United States, and Chief Tidwell is responsible for administering and ensuring that all National Forests, including the White River National Forest, are managed in compliance with applicable statutes, regulations, and policies.  Accordingly, Chief Tidwell is ultimately responsible for the decision at issue.

10.     Defendant Scott Fitzwilliams is the Forest Supervisor for the White River National Forest, and was the signatory to the Service's September 27, 2013 egress trail decision. As the Forest Supervisor, Mr. Fitzwilliams is also responsible for the decision at issue.

11.     Defendant Maribeth Gustafson is the Deputy Regional Forest for the Service's Rocky Mountain Region.  Ms. Gustafson not only issued the 2006 egress trail decision when she was the White River National Forest Supervisor, but she also served as the Appeal Deciding Officer in denying Plaintiffs' administrative appeal concerning the Service's September 2013 egress trail decision.  Accordingly, Ms. Gustafson is also responsible for the decision at issue.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The Wilderness Act and USFS Roadless Regulations

12.     Through the Wilderness Act, 16 U.S.C. §§ 1131-1136, Congress created the National Wilderness Preservation System on public lands "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness."  *Id.* § 1131(a). Congress directed that wilderness areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas [and] the preservation of their wilderness character."  *Id.*  Congress further directed that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character."  *Id.* § 1133(b).

13.     Congress defined "wilderness" as an area "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and where "the imprint of man's work [is] substantially unnoticeable."  *Id.* § 1131(c).  The Act also set forth

6

objective criteria by which federal agencies must assess eligibility of public lands for potential

long-term wilderness preservation. *Id.*  Among other protections afforded designated wilderness

is a prohibition against roads: "there shall be . . . no permanent road within any wilderness area

designated by this chapter and . . . there shall be no temporary road." *Id.* § 1133(c).

14.     As a threshold step in determining the eligibility of National Forest lands for

wilderness designation, and therefore preserving such lands until the Service can decide whether

to recommend designation of those lands to Congress for long-term wilderness preservation, the

Service "[i]dentif[ies] and evaluate[s] lands that may be suitable for inclusion in the National

Wilderness Preservation System," which is often completed as part of a Forest Plan revision

process.  36 C.F.R. § 219.7(c)(2)(v).  In its implementing regulations, the Service recognizes that

"[w]ilderness will be made available for human use to the optimum extent consistent with the

maintenance of primitive conditions," and that "[i]n resolving conflicts in resource use,

wilderness values will be dominant to the extent not limited by the Wilderness Act, subsequent

establishing legislation, or the regulations in this part."  *Id.* §§ 293.2(b)-(c).

15.     Because the nonexistence of roads is a key feature of wilderness under the Act

and USFS regulations, *see* 16 U.S.C. § 1133(c); 36 C.F.R. § 293.6 ("there shall be in National

Forest Wilderness . . . no temporary or permanent roads"), the Service regularly conducts an

"inventory," often as part of a forest planning process, to determine what National Forest lands

contain "roadless" characteristics, so that roadless areas can be preserved by the Service as

potential wilderness until such time as the Service can prepare a wilderness study and ultimately

recommend some or all of those roadless lands for wilderness designation to Congress.  *See* 43

CFR § 19.2 (Department of Interior regulation explaining that "[r]oadless area means a

reasonably compact area of undeveloped Federal land which *possesses the general*

7

*characteristics of a wilderness and within which there is no improved road* that is suitable for

public travel by means of fourwheeled, motorized vehicles intended primarily for highway use")

(emphasis added).  These "inventoried roadless areas" are "identified in a set of inventoried

roadless area maps," although the Service may "subsequent[ly] update or revis[e] . . . those maps

through the land management planning process."  36 C.F.R. § 294.11.

16.      According to the Service, the primary reason that the Service has, since 1967,

conducted regular roadless inventories is to identify possible future wilderness areas and thus to

implement the Wilderness Act.  *See, e.g.*, September 15, 2004 Consolidated Decision on Appeals

of the WRNF Revised Land and Resource Management Plan ("Forest Plan") at 35 ("The first

step in the evaluation of potential wilderness is to identify and inventory all roadless,

undeveloped areas that satisfy the definition of wilderness found in section 2(c) of the 1964

Wilderness Act"); *see also* 70 Fed. Reg. 25656 ("It is important to note that Congressional

reviews of inventoried roadless areas for consideration as potential wilderness primarily have

been conducted on a state-by-state basis for the past 25 years"); *Wyo. v. Dept. of Agric.*, 277 F.

Supp. 2d 1197, 1204-05 (D. Wyo. 2003) ("In 1967, the Forest Service embarked on the Roadless

Area Review Evaluation, which was a nationwide inventory of the National Forest System to

identify areas that could be designated as 'wilderness' pursuant to the Wilderness Act" and "[i]n

1977, the Forest Service began a new Roadless Area Review . . . [which] like its predecessor,

was administratively initiated for the purpose of identifying those roadless and undeveloped

areas which could be designated as 'wilderness areas' pursuant to the Wilderness Act.").  For

this reason, the terms "roadless area" and "potential wilderness" are synonymous.

**B.**      **The Roadless Area Conservation Rule and Inventory Regulations**

17.      In 2001, with overwhelming public support, the Service promulgated the Roadless

Area Conservation Rule ("RACR") which recognized that roadless areas have many important

values and uses in addition to possible wilderness designation and accommodate certain uses that

are disallowed in Wilderness Areas.  To protect roadless qualities of the lands identified through

roadless inventories – summarized by the Service in a set of Inventoried Roadless Area ("IRA")

maps incorporated into the RACR Final Environmental Impact Statement ("EIS") – the RACR

established various restrictions on development in roadless lands, including limitations on

logging, road building, and motorized use.

18.      The RACR included a list of "[r]esources or features that are often present in and

characterize roadless areas," including:

| | |
|---|---|
| (1) | High quality or undisturbed soil, water, and air; |
| (2) | Sources of public drinking water; |
| (3) | Diversity of plant and animal communities; |
| (4) | Habitat for threatened, endangered, proposed, candidate, and sensitive species, and for those species dependent on large, undisturbed areas of land; |
| (5) | Primitive, semi-primitive non-motorized and semi-primitive motorized classes of dispersed recreation; |
| (6) | Reference landscapes; |
| (7) | Natural-appearing landscapes with high scenic quality; |
| (8) | Traditional cultural properties and sacred sites; and |
| (9) | Other locally identified unique characteristics. |

36 C.F.R. § 294.11 (2007).  Although these resources and features are often present in roadless

areas, this list does not specify what minimum parcel size may qualify as a roadless area, nor

does it indicate which types of alterations or improvements disqualify parcels for inclusion into

the roadless inventory.  The Service therefore uses a more precise set of measurable criteria to

evaluate whether particular USFS lands are sufficiently unroaded and undeveloped to qualify for

inclusion into the nation's roadless inventory and considered for future wilderness designation.

These criteria, which derive from the criteria listed in the Wilderness Act, 16 U.S.C. §

1131(c), have been promulgated in Forest Service Handbook 1909.12, Chapter 70 ("FSH

1909.12, 70). *See* http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?1909.12.  As explained in

the preamble to this land management handbook, FSH 1909.12,70 constitutes the Service's

"process for identifying and evaluating potential wilderness" and to "determine whether areas are

to be recommended for wilderness designation by Congress."

19.     First issued on August 3, 1992, the Service's roadless inventory criteria were

initially codified at FSH 1909.12, Chapter 7.  On January 31, 2007, the Service re-indexed the

inventory criteria to FSH 1909.12, Chapter 70 to accommodate the Service's new "2-digit coding

scheme."  *See* FSH 1909.12,70.  The agency also replaced all references to "roadless areas" in

the former with the phrase "potential wilderness areas" in the latter, recognizing that the terms

are synonymous.  This modification – when read in the context of the purpose of the RACR and

the Service's consistent explanations over time that the nation's roadless inventory is used to

identify potential wilderness areas – was clearly intended to bring any roadless or potential

wilderness lands identified through inventories after 2001 under the regulatory umbrella of the

RACR.

20.     For National Forest System lands west of the 100th Meridian, including Colorado,

the Service uses the following measurable inventory criteria set forth in FSH 1909.12,71.1:

> Areas qualify for placement on the potential wilderness inventory if they meet the
> statutory definition of wilderness.  Include areas that meet either criteria 1 and 3,
> or criteria 2 and 3 below.  In addition, they may have improvements if they meet
> the criteria in section 71.11. . . .

> 1.     Areas contain 5,000 acres or more.

> 2.     Areas contain less than 5,000 acres, but can meet one or more of the
>        following criteria:

      a.      Areas can be preserved due to physical terrain and natural conditions.

      b.      Areas are self-contained ecosystems, such as an island, that can be effectively managed as a separate unit of the National Wilderness Preservation System.

      c.      Areas are contiguous to existing wilderness, primitive areas, Administration-endorsed wilderness, or potential wilderness in other Federal ownership, regardless of their size.

3.      Areas do not contain forest roads (36 CFR § 212.1) or other permanently authorized roads.

FSH 1909.12,71.1.

21.      The Forest Service's handbook further explains that a parcel of National Forest land may contain some developments – such as an airstrip, power lines, and radio towers – and have experienced some alterations such as logging and still meet the tests of roadless and potential wilderness under the inventory criteria:

Areas may qualify for the inventory of potential wilderness even though they include the following types of areas or features:

1.      Airstrips and heliports.

2.      Cultural treatments involving plantations or plantings where the use of mechanical equipment is not evident.

3.      Electronic installations, such as cell towers, television, radio, and telephone repeaters, and the like, provided their impact is minimal.

4.      Evidence of historic mining (50+ years ago).  Do not include areas of significant current mineral activity, including prospecting with mechanical or motorized earthmoving equipment.  The inventory may include areas where the only evidence of prospecting is holes that have been drilled without access roads to the site.  Potential wilderness also may include:

      a.      Areas that otherwise meet inventory criteria if they are covered by mineral leases having a "no surface occupancy" stipulation.

      b.      Areas covered by mineral leases that otherwise meet inventory criteria only if the lessee has not exercised development and

occupancy rights.  If and when these rights are exercised, remove the area, or portion affected, from the inventory unless it is possible to establish specific occupancy provisions that would maintain the area in a condition suitable for wilderness.

5.  Structures or evidence of vegetative manipulation resulting from past management practices in National grasslands and prairies.  National Grassland and Prairie areas that contain the following features may qualify for the inventory:

   a.  Areas where vegetation type conversions are reverting to native vegetation with minimal evidence of cultivation.

   b.  Areas with less than one mile of interior fence per section.

6.  Federal ownership of less than 70 percent if it is realistic to manage the Federal lands as wilderness, independent of the private land.

7.  Minor structural range improvements (FSM 2240.5), such as fences or water troughs.  Exclude areas where nonstructural range improvements are readily visible and apparent.  Areas with spray or burning projects are permissible if there is little or no evidence of the project.

8.  Recreation improvements such as occupancy spots or minor hunting or outfitter camps.  As a general rule, do not include developed sites.  Areas with minor, easily removable recreation developments may be included.

9.  Timber harvest areas where logging and prior road construction are not evident, except as provided in Section 71.12 for areas east of the 100th meridian.  Examples include those areas containing early logging activities related to historic settlement of the vicinity, areas where stumps and skid trails or roads are substantially unrecognizable, or areas where clearcuts have regenerated to the degree that canopy closure is similar to surrounding uncut areas.

10.  Ground-return telephone lines, electric lines, and powerlines if a right-of-way has not been cleared.

11.  Watershed treatment areas if the use of mechanical equipment is not evident.  The inventory may include areas where minor watershed treatment has been accomplished manually such as small hand-constructed gully plugs.

FSH 1909.12,71.11.

22.     In making an objective determination of whether a parcel satisfies the roadless criteria specified in FSH 1909.12, 70 and thus must be included in the roadless inventory, the Service in its "application of the inventory criteria should rely on local knowledge and judgment regarding unique, site-specific conditions of each area being considered for placement on the inventory of potential wilderness."  FSH 1909.12,71.  Lands that are found to meet the inventory criteria are "identified in a set of inventoried roadless area maps," although the Service may "subsequent[ly] update or revis[e] . . . those maps through the land management planning process."  36 C.F.R. § 294.11.

D.      **National Environmental Policy Act**

23.     Congress created NEPA more than four decades ago "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  To achieve NEPA's substantive goals, Congress created two specific mechanisms whereby federal agencies must evaluate the environmental and related impacts of a particular federal action – an EA and an EIS.  *See* 42 U.S.C. § 4332(c).  These procedural mechanisms are designed to inject environmental considerations "in the agency decisionmaking process itself," and to "'help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.'"  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768-69 (2004) (emphasis added) (quoting 40 C.F.R. § 1500.1(c)).  Therefore, "NEPA's core focus [is] on improving agency decisionmaking," *Pub. Citizen*, 541 U.S. at 769 n.2, and specifically on ensuring that agencies take a "hard look" at potential environmental impacts and environmentally enhancing

alternatives "as part of the agency's process of deciding whether to pursue a particular federal action." *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983).

24.     An EIS must be prepared by an agency for every "major Federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(c).  Under the Council on Environmental Quality's ("CEQ") regulations that implement NEPA, "significance" requires consideration of both context and intensity.  "Context" considerations include the affected region, interests and locality, varying with the setting of the action, and include both short and long-term effects.  "Intensity" refers to the severity of impact, including impacts that may be both beneficial and adverse; unique characteristics of the geographic area, such as proximity to wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act; and whether the action threatens a violation of federal law imposed for the protection of the environment.  *See* 40 C.F.R. § 1508.27.

25.     Where an action is not expected to result in a significant environmental impact, the agency must still prepare an EA and a FONSI.  *Id.* §§ 1508.9, 1501.3.  When considering whether to authorize actions in roadless areas, agencies must fully consider and disclose the impacts of the action that will result from the potential loss of roadless/wilderness characteristics and natural qualities.  Thus, with respect to inventoried roadless areas, the Service's regulations

require an EIS for "[p]roposals that would substantially alter the undeveloped character of an inventoried roadless area or a potential wilderness area."  36 C.F.R. § 220.5(a)(2); *see also id.* at § 294.45(a) (explaining that "[p]roposed actions that would significantly alter the undeveloped character of a Colorado Roadless Area require an [EIS]").

26.    Even where an area has roadless/wilderness qualities, but is not officially labeled as a potential wilderness or roadless area, NEPA likewise requires a hard look at the loss of those qualities before an agency can proceed with such an action that may affect those qualities. Hence, courts have held that the Service must analyze under NEPA areas that are in fact roadless – *regardless of their administrative label* – as if they are inventoried roadless areas for purposes of disclosing the effects to these unique areas. *See, e.g.*, *Lands Council v. Martin*, 529 F.3d 1219, 1230-32 (9th Cir. 2008).  Otherwise, the failure to disclose such effects before construction, tree cutting, or other development commences could permanently disqualify such areas from future wilderness designation and would undermine the explicit purposes of the Wilderness Act as well as NEPA.  Similarly, in disclosing the effects to these roadless areas – whether or not they have been formally inventoried as "roadless" by the Service – the Wilderness Act and NEPA require consideration of roadless areas in combination with other adjoining roadless and wilderness areas creating a single contiguous tract of lands that are, in fact, roadless.  *Id.*  The failure to do so, before authorizing potentially irreversible activities to proceed, constitutes a patent violation of NEPA.  *Id.*; *Smith v. USFS*, 33 F.3d 1072, 1078-79 (9th Cir. 1994).

27.    NEPA and its implementing regulations require that, unless limited exceptions apply, the "lead agency *shall* [i]nvite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, *and other interested persons (including those who might not be in accord with the action on environmental grounds)*."

40 C.F.R. § 1501.7(a)(1) (emphases added).  The regulations further state that "agencies *shall . . .* [p]rovide public notice of NEPA-related hearings, public meetings, and *the availability of environmental documents so as to inform those persons and agencies who may be interested or affected*."  *Id.* § 1506.6(b) (emphases added).  This means that "[i]n *all* cases the agency shall mail notice to those who have requested it on an individual action," and for national rules notice must include "notice by mail to national organizations reasonably expected to be interested in the matter" and for local rules notice must include "[n]otice to potentially interested community organizations."  *Id.* §§ 1506.6(b)(1)-(3).

## FACTUAL BACKGROUND

A.  **The Service's 1997 Roadless Determination Concerning the Burnt Mountain IRA and the 2002 Forest Plan Revision**

28.      Over several decades, the Service has granted Aspen Skiing Company ("ASC") certain special use permit authorizations to establish and operate the Snowmass Ski Area on portions of the White River National Forest in Colorado.  The easternmost portion of ASC's authorization is on a peak called Burnt Mountain, which is National Forest land in the White River National Forest.  The Snowmass Ski Area is one of the largest commercial ski resorts in the country, with more vertical feet of skiing than any other ski resort in the United States.

29.      In 1997, based on the natural and unroaded condition of Burnt Mountain, the Service determined that a 1,712-acre parcel on Burnt Mountain – some of which fell within ASC's Snowmass Ski Area special use permit boundary – satisfied the agency's FSH 1909.12,70 roadless inventory and potential wilderness criteria and the agency thereby added all 1,712 acres to its roadless inventory and associated roadless maps.  This parcel, which has long been referred to as the Burnt Mountain IRA, is directly adjacent to the Maroon Bells-Snowmass Wilderness Area, which Congress permanently designated in 1964 as a 181,602-acre wilderness area

pursuant to the Wilderness Act.  *See* 16 U.S.C. §§ 1131-1136.  Due to its lack of historic

development, the lands on Burnt Mountain east of the Long Shot ski trail – including all of the

1,712-acre Burnt Mountain IRA designated roadless by the Service in 1997 – have remained in a

natural and unroaded state, and have served as an important wildlife habitat and linkage corridor

for Canada lynx, which is a federally listed "threatened" species*,* as well as elk, foxes, coyote,

mountain lions, bears, and other native animals.

      30.     In 2002, after the Service promulgated the RACR, the Service completed a long-

term analysis of the White River National Forest via a Land and Resource Management Plan

revision process ("2002 Forest Plan").  As part of the 2002 Forest Plan, the Service updated its

roadless inventory and explicitly determined that the 1,712-acre Burnt Mountain IRA – including

the portion falling within the ASC ski area special use permit boundary – continued to satisfy the

FSH 1909.12,70 roadless and potential wilderness inventory criteria as a factual matter and thus

remained on the agency's roadless inventory and associated maps for the White River National

Forest as IRA # 76.  *See* Service, 2002 Forest Plan EIS Appendix C at C-11; *see also* Service,

September 15, 2004 Consolidated Decision on Appeals of the WRNF Forest Plan at 35-36.

      **B.**     **The Service's 2006 Burnt Mountain Egress Trail Decision**

      31.     After issuance of the 2002 Forest Plan, the Service authorized ASC's 2003 Master

Plan Amendment for the Snowmass Ski Area that would allow ASC to undertake various

activities in the future, including on White River National Forest lands on Burnt Mountain.  On

February 16, 2006, pursuant to the 2003 Master Plan Amendment, the Service – via White River

National Forest Supervisor Maribeth Gustafson – signed a Decision Notice, EA, and FONSI

authorizing ASC to undertake development activities at the Snowmass Ski Area to implement

the Master Plan Amendment.  Among other activities authorized by the 2006 decision was

limited selective tree removal on the upper part of Burnt Mountain known as the "glades" area that was not part of the 1,712-acre Burnt Mountain IRA, and also creation of a clearcut and graded egress trail from the glades area back to the Long Shot ski trail which would cut through the 1,712-acre Burnt Mountain IRA where it overlaps with ASC's special use permit boundary.

32.      Despite the fact that the egress trail authorized by the Service would cut through the Burnt Mountain IRA and could very well impair the parcel's roadless conditions and future eligibility for potential wilderness consideration, the Service's Forest Supervisor asserted that "I am confident that the effects of the approved egress trail will not result in any substantial changes in the character of Inventoried Roadless Area #76."  However, that assertion was not supported by the Decision Notice, EA, and FONSI, which failed to analyze at all the site-specific impacts of construction and operation of an egress trail on the roadless and wilderness condition of the parcel.

33.      On April 12, 2006, The Ark Initiative, Donald Duerr, Scott Schlesinger, and others administratively appealed the Service's 2006 decision, partly on the grounds that the egress trail would cut through part of the Burnt Mountain IRA, thus adversely impacting the parcel's roadless and wilderness qualities, which the Service had not disclosed or analyzed at all, much less in an EIS.

34.      In reviewing the appeal, the Service's Appeal Reviewing Officer explained that the 1,712-acre Burnt Mountain IRA "was designated as a roadless area due to the fact that it is contiguous to the designated Maroon Bells-Snowmass Wilderness Area," and that "[t]he IRA overlaps the Snowmass Ski Area and Management Area (MA) 8.25 on 75 acres."  The Appeal Reviewing Officer ruled against the Service on this issue, "recommend[ing] the Forest Supervisor be reversed . . . [in connection with the lack of] analysis and disclosure of effects to

18

the Burnt Mountain IRA."  The Appeal Reviewing Officer further "recommend[ed] the Forest

Supervisor be instructed not [to] conduct any work within the Burnt Mountain IRA in

Management Area 8.25 at Snowmass Ski Area until sufficient analysis of the impacts to the IRA

can be disclosed."

      35.    On May 22, 2006, the Service's Appeal Deciding Officer – the agency official

who makes the final determination for the Service – "concur[red] with the Appeal Reviewing

Officer's recommendation," stating that "[y]our requested relief related to the Inventoried

Roadless Issues inside the Burnt Mountain Roadless Area #76 is granted and actions associated

with the Burnt Mountain Ski Traverse and Ski Trail Development may not be implemented."

The Appeal Deciding Officer explained that "[i]f the Forest Supervisor decides to proceed with

that portion of the Snowmass MPA-SAI proposal, within the Burnt Mountain Inventoried

Roadless Area in Management Area 8.25 at Snowmass Ski Area, a new decision will be

required," which, at minimum, must "include the effects of the proposed action on the

Inventoried Roadless Area."

     **C.**     **The State of Colorado Petitions for a New Roadless Rule Concerning Ski**
           **Areas in the Aftermath of Plaintiffs' Burnt Mountain Egress Trail Victory**

      36.      On May 13, 2005, the Service promulgated a final rule amending the 2001

RACR to grant each State the opportunity to petition the Secretary of Agriculture in order to

request State-level roadless regulations to supersede the RACR within the State's borders.  *See*

36 C.F.R. § 294.12.  The 2005 rule contained a firm filing deadline: "[a]ny such petition must be

submitted to the Secretary of Agriculture not later than November 13, 2006."  *Id.*  The preamble

to the rule explained that "[i]f the Secretary directs a State-specific rulemaking, a proposed rule

would be published in the Federal Register for public review and comment," and further that

"individual units of the National Forest System have Internet Web sites and mailing lists that will

19

also provide notice to interested individuals, whether local or not."  70 Fed. Reg. 25654, 25658 (May 13, 2005).

37.     The Service's 2005 rule authorized State roadless petitions to request the establishment of new "management requirements" for IRAs, *see* 36 C.F.R. § 294.12, such as where logging and road construction would be allowed within an IRA to reduce the risk of wildfire to nearby homes.  *See id.* § 294.14(a)(3) (explaining that a State petition could seek to address "reducing hazardous fuels").  The 2005 rule also granted very narrow authority to make changes to the roadless inventory adopted in the RACR to make "*technical corrections* to existing [IRA] maps such as boundary adjustments to remove *existing roaded* areas."  *Id.* § 294.14(a)(3) (emphases added).  The Service made clear that the explicit purpose of any State rule was to add roadless protections *above the floor* set by the RACR, by focusing on "conserving roadless area values and characteristics; protecting human health and safety; reducing hazardous fuels and restoring essential wildlife habitats; maintaining existing facilities such as dams; or providing reasonable access to public and private property or public and privately owned facilities; and [making] technical corrections to existing maps such as boundary adjustments to remove existing roaded areas."  36 C.F.R. § 294.14(a)(3).

38.     On June 21, 2006 – only a few weeks after the Appeal Deciding Officer granted Plaintiffs' administrative appeal enjoining construction of the egress trail in the Burnt Mountain roadless area pending further analysis – Forest Supervisor Gustafson and other Service officials attended a Roadless Areas Review Task Force meeting in Glenwood Springs, Colorado.  According to Service meeting notes, this meeting was convened to discuss the possibility of developing a State-specific roadless rule for Colorado in accordance with the 2005 RACR amendment.  At this meeting, a ski industry trade group representing ASC and other Colorado

ski resorts announced that it was going "to urge the Task Force and the Governor to recommend removal from roadless inventory areas [IRAs] that are allocated in Forest Plans to ski area special uses." On information and belief, this proposal was instigated at least in part by Plaintiffs' egress trail administrative appeal ruling enjoining construction of the egress trail through part of the Burnt Mountain IRA that overlapped the Snowmass Ski Area special use permit boundary. Despite the Service's knowledge that Plaintiffs were acutely interested in the fate of roadless areas in the White River National Forest, and Burnt Mountain in particular – and that Plaintiffs' interests would be adversely affected by a proposal to remove IRA lands within ski area special use permit boundaries from the roadless inventory – Plaintiffs were not notified of or invited to attend this Task Force meeting or any other meeting.

39.     On November 13, 2006, the State of Colorado submitted its petition to the Service requesting a Colorado-specific roadless rule to supersede the RACR on National Forest lands in Colorado. Colorado's petition addressed the ski industry's request by proposing that the Service "shall remove from [the] roadless inventory all areas allocated by the USFS in Colorado to ski area special uses, including all areas inside special use permit boundaries." The petition explained that "[t]his boundary adjustment by itself does not authorize activities within ski area boundaries," and that "[t]hose activities shall be proposed and analyzed as required by existing law and authorization."

40.     On April 11, 2007 – nearly six months after the deadline for submitting a State roadless petition – the State of Colorado submitted a modified petition. *See* 76 Fed. Reg. 21272, 21272-73 (Apr. 15, 2011). On April 6, 2010 – more than three years after the deadline for submitting a state roadless petition – the State of Colorado submitted yet another significantly modified roadless petition. *Id.* at 21274. In both revised petitions, the State continued to seek

roadless inventory exclusion for National Forest lands falling within ski area boundaries pursuant to USFS special use permits.

41.     The State of Colorado did not explain in any of its roadless petitions how the Service could lawfully seek removal of parcels from the roadless inventory that, as a factual matter, satisfied the Service's roadless criteria found at FSH 1909.12, 70.  Nor did the State explain how such removal could be based on economic or commercial grounds without coming into conflict with the Wilderness Act – which the roadless regulations implement – or FSH 1909.12, 70.  Nor, for that matter, did the State explain how removal of roadless-in-fact IRAs from the roadless inventory was necessary to "conserv[e] roadless area values and characteristics; protect[] human health and safety; reduc[e] hazardous fuels and restor[e] essential wildlife habitats . . . [or make] technical corrections to existing maps such as boundary adjustments to remove existing roaded areas," as required by Service regulation.  36 C.F.R. § 294.14(a)(3).

### D.     The Service's 2012 Colorado Roadless Rule

42.     Acting on the State of Colorado's April 11, 2007 and April 6, 2010 petitions, the Service initiated the CRR rulemaking process.  Although The Ark Initiative, Donald Duerr, and Scott Schlesinger were clearly interested parties with respect to any RACR changes being contemplated by the Service that would adversely affect the roadless condition and potential wilderness eligibility of the Burnt Mountain IRA – and, indeed, the State of Colorado evidently sought a ski area roadless exclusion at least in large part because of Plaintiffs' administrative appeal victory with respect to the egress trail in the Burnt Mountain IRA – the Service never contacted, much less invited their participation in the CRR process, as required by the Service's own regulations.  The Service's failure to notify Plaintiffs of the CRR and its potential adverse

impact on their interests occurred notwithstanding that the Service's White River National Forest was keenly aware of Plaintiffs' interest after having recently granted their administrative appeal on the egress trail, and also the agency's explicit acknowledgement that "individual units of the National Forest System have . . . mailing lists that will also provide notice to interested individuals, whether local or not."  70 Fed. Reg. at 25658.  In addition to submitting comments and administrative appeals on issues concerning Burnt Mountain, at various times over the past decade Plaintiffs have formally requested that the Service ensure that they receive notification of any proposed rules, decisions, or other activities affecting the Burnt Mountain IRA, and yet received no notification concerning the CRR and its potential effect on Plaintiffs' interests.

43.     On July 3, 2012, the Service issued the final CRR, along with an accompanying landscape-level EIS, with respect to Colorado Roadless Areas ("CRAs") in response to the State's April 2010 petition. 36 C.F.R. §§ 294.40-294.49.  As the CRR explains, "[t]he intent of this regulation is to protect roadless values by restricting tree cutting, sale, and removal; road construction and reconstruction; and linear construction zones within" CRAs.  36 C.F.R. § 294.40; *see also id.* § 294.42 (generally prohibiting tree cutting in roadless areas).  Identical to the 2001 RACR, the CRR – codified at 36 C.F.R. § 294.41 – provides a list of "[r]esources or features that are often present in and characterize Colorado Roadless Areas" including:

(1)     High quality or undisturbed soil, water, and air;
(2)     Sources of public drinking water;
(3)     Diversity of plant and animal communities;
(4)     Habitat for threatened, endangered, proposed, candidate, and sensitive species, and for those species dependent on large, undisturbed areas of land;
(5)      Primitive, semi-primitive nonmotorized and semi-primitive motorized classes of dispersed recreation;
(6)     Reference landscapes;
(7)     Natural-appearing landscapes with high scenic quality;
(8)     Traditional cultural properties and sacred sites; and
(9)     Other locally identified unique characteristics.

44.     In issuing the CRR, the Service reinforced that all roadless area management

decisions under the CRR must be guided by the agency's own land management handbook

where the Service's objective roadless inventory criteria implementing the Wilderness Act are

found.  *See, e.g.*, 77 Fed. Reg. 39588-91 (CRR preamble stating that "[r]oadless inventory

procedures follow [FSH] 1909.12"); July 2012 CRR Final EIS at H-72 ("FSH 1909.12 Chapter

70 is the standard used to map roadless areas").  Thus, in promulgating the CRR, the agency

continued to claim that it was adhering to, and was required to adhere to, the inventory criteria

established to carry out the Service's statutory duties.  Under the CRR, after the Service has, as

part of an inventory, determined that a parcel of National Forest land satisfies the criteria found

in FSH 1909.12, 70, the agency adds it to the list of CRAs found at 36 C.F.R. § 294.49 and

identifies it as a roadless area on "a set of maps maintained at the national headquarters office of

the Forest Service."  36 C.F.R. § 294.41.  Once deemed to satisfy the roadless criteria of the

agency's handbook, a CRA – just as with an IRA before the CRR – indefinitely remains on the

roadless inventory until and unless: (a) Congress formally designates it as a wilderness area

pursuant to the Wilderness Act, or (b) the agency determines that, as a factual matter, the parcel

no longer satisfies the roadless criteria specified in FSH 1909.12, 70 and removes the parcel

from the inventory on that basis.

45.     Despite the 2005 rule's restriction limiting the Service to adopting State-based

RACR modifications constituting "technical corrections . . . to remove existing roaded areas" or

changes needed to address other concerns such as reducing fuel hazards to avoid wildfire risks in

populated areas, *see* 36 C.F.R. § 294.14(a)(3), when the Service issued the CRR it concurrently

adopted a sweeping new roadless inventory for National Forest System lands in Colorado,

reflected in a set of CRA maps.  Many of the CRA boundaries diverge significantly from the

IRA boundaries established in the 2001 RACR, and the changes go far beyond mere "technical corrections" to exclude roaded areas or revisions to address public safety concerns.  In particular, the CRR and associated CRA maps removed 8,260 IRA acres – amounting to roughly 13 square miles – from the roadless inventory that the Service had previously determined under the RACR, as a factual matter, satisfied the FSH 1909.12, 70 roadless criteria.  These 8,260 IRA acres – which generally have not been roaded or otherwise developed, although ski resort operators desire to develop these public lands in the future – fall within ski area permit boundaries pursuant to previously authorized USFS special use permits to private ski resorts.  *See* 77 Fed. Reg. at 39578.

46.     The removal of these 8,260 IRA acres from the roadless inventory was not based on whether these parcels no longer satisfied – as a factual matter – the agency's own roadless and potential wilderness criteria identified in FSH 1909.12, 70, nor were they based on addressing "technical corrections to existing maps such as boundary adjustments to remove existing roaded areas" or other enumerated concerns such as wildfires.  36 C.F.R. § 294.14(a)(3). Rather, while the Service generally alluded in the CRR preamble to the fact that "Colorado skiers spend about $2.6 billion annually" without explaining how that assertion relates to the agency's roadless criteria, the explicit rationale provided by the Service in the CRR to justify removing these 8,260 IRA acres from the roadless inventory was the agency's purported conclusion that these parcels consist of "roadless acres with degraded roadless area characteristics due to the proximity to a major recreational development" – i.e., an operational ski resort.  77 Fed. Reg. at 39578.  Thus, the agency purported to make a generalized factual determination – at the landscape level without the benefit of any site-specific ground-truthing or other confirmation – that parcels situated proximate to operational ski areas necessarily consist of "degraded roadless

area characteristics." *Id.* Nowhere in the FSH 1909.12,70 inventory criteria – which the CRR preamble continues to recognize as the agency's guiding directive on roadless inventory management in order to effectuate the Wilderness Act and other governing statutes – is there any suggestion that mere proximity to a ski area or any other recreational development disqualifies unroaded lands from inclusion in the roadless inventory or from future wilderness consideration.

47.     The CRR preamble made clear that "[t]he final rule does *not* authorize the implementation of any ground-disturbing activities, but rather it describes circumstances under which several activities *may be allowed or restricted in CRAs*." 77 Fed. Reg. at 39591 (emphases added). Thus, "[b]efore authorizing land use activities in roadless areas, the Forest Service *must complete a more detailed and site-specific environmental analysis pursuant to NEPA and its implementing regulations*." *Id.* (emphasis added).

48.     Among the 8,260 IRA acres that were removed from the CRA roadless inventory because they happened to fall within ski area special use permit boundaries is an 80-acre IRA parcel on Burnt Mountain. This 80-acre parcel is the same parcel in which Defendant Gustafson attempted to authorize egress trail construction in 2006 before that decision was reversed by the Service's Appeal Deciding Officer because the Service had failed to consider and analyze the impacts of egress trail construction and operation on the parcel's roadless characteristics and future wilderness eligibility.

49.     Although the landscape-level CRR, CRR preamble, and CRR EIS generally discuss the removal of 8,260 IRA acres from the roadless inventory on the grounds that those parcels overlap with ski area special use permits and are therefore purportedly degraded, none of those documents analyzes at the site-specific level the impacts to roadless and wilderness characteristics of egress trail construction on the 80-acre parcel of the Burnt Mountain IRA

removed from the roadless inventory, nor do they analyze whether the 80-acre portion is, in fact, degraded by its proximity to the Snowmass ski resort – i.e., whether the generalized rationale provided by the Service in the CRR for removal of the 8,260 IRA acres from the roadless inventory is in fact applicable to this 80-acre parcel.

      E.    **The Service's 2013 Egress Trail Decision**

      50.    On February 20, 2013 – only seven months after issuing the CRR – the Service initiated a site-specific decisionmaking process to authorize construction and operation of an egress trail in the 80-acre parcel that the CRR purported to remove from the Burnt Mountain IRA (along with 8,180 other acres throughout Colorado) on the grounds that it consists of "degraded roadless area characteristics" merely due to its "proximity to a major recreational development." 77 Fed. Reg. at 39578.  This site-specific decision constitutes the first Service decisionmaking process in this parcel since CRR promulgation seeking to apply the CRR's ski area special use permit exclusion to "authorize the implementation of . . . ground-disturbing activities."  77 Fed. Reg. at 39591.

      51.    On March 25, 2013, Plaintiffs submitted extensive scoping comments raising various concerns including that the parcel continued to satisfy the agency's roadless criteria in FSH 1909.12, 70, the generalized rationale in the CRR for removing this parcel from the roadless inventory was not factually applicable to this parcel as demonstrated at the site-specific level, an EIS was required under the circumstances, and the Service could not proceed until and unless it took a hard look at the impacts that egress trail construction and operation would cause to the parcel's roadless and wilderness characteristics as required by NEPA and the 2006 administrative appeal disposition.

52.     In August 2013, the Service issued a Draft EA.  For the first time, the Service in

the egress trail Draft EA proffered a new rationale for why the Service had removed this parcel

and 8,180 other acres in Colorado from the roadless inventory in the CRR, which was

purportedly "to better balance the social and economic importance of ski areas with the need to

conserve roadless area characteristics."  Because the Draft EA did not address Plaintiffs'

previously raised concerns, Plaintiffs submitted detailed comments on September 6, 2013

reiterating their prior concerns.  Again, Plaintiffs explained that an EIS was required, and further

urged that "the Service is *now* obligated in this *site-specific* implementation decisionmaking

process to analyze whether this 80-acre parcel is, in fact, degraded to the extent that the parcel no

longer satisfies the Service's roadless criteria" due to its proximity to an operational ski resort.

Plaintiffs presented evidence documenting why this particular parcel continued to satisfy the

agency's roadless and potential wilderness criteria found in FSH 1909.12, 70, and thus why an

egress trail should not be constructed at all, or at minimum not until an EIS is prepared to

analyze the potential loss of roadless and wilderness characteristics.

53.     On September 27, 2013, the Service issued its final Decision Notice, FONSI, and

Response to Comments authorizing construction and long-term operation of an egress trail on the

80-acre parcel that previously was part of the Burnt Mountain IRA.  The Service did not prepare

an EIS, much less a Final EA, and instead incorporated and relied on its August 2013 Draft EA

as part of its final decision.

54.     In its final decision, the Service did not analyze on a site-specific basis whether

this particular parcel is so degraded by its proximity to the Snowmass ski resort that it no longer

satisfies the roadless inventory criteria found in FSH 1909.12, 70 – i.e., whether the blanket

rationale provided by the Service's CRR for removing 8,260 IRA acres from the roadless

inventory is in fact applicable to *this* parcel.  Despite the agency's refusal to consider Plaintiffs'

evidence and determine the applicability of the blanket degradation rationale to this parcel, the

Service's Draft EA suggested that this parcel remains in an unroaded and natural condition, and

that this parcel continues to satisfy the roadless inventory criteria found in FSH 1909.12, 70,

consistent with the agency's determinations in 1997 and 2002 concerning this parcel.  *See* Draft

EA at 2-8 ("*There is little evidence of ski area operations and maintenance in the area*, and the

*natural qualities* would be maintained under" the no action alternative) (emphasis added); *id.* at

3-18 (noting that "[n]o projects or developments have occurred within the 80-acre area"); *id.* at

3-19 (describing the parcel's "*lack of historic development and disturbance*") (emphasis added);

*id.* at 3-19 (explaining that "the 80-acre area provides a *semi-primitive, non-motorized*

recreational experience") (emphasis added).  These statements in the Draft EA are consistent

with evidence presented by Plaintiffs during the decisionmaking process further underscoring

that this unroaded parcel satisfies the roadless and potential wilderness criteria in FSH 1909.12,

70.

55.     Rather than apply the rationale proffered in the CRR in this site-specific

decisionmaking process to determine whether the blanket "degradation by proximity"

assumption is in fact applicable to this parcel, the Service's final egress trail decision again

proffered and relied upon a new and different rationale for removing this (and other) parcels

from the roadless inventory never specifically explicated in the CRR: "[t]he State requested that

the Forest Service take this action [in the CRR] to better balance the *social and economic*

*importance of ski areas* with the need to conserve roadless area characteristics, as well as acres

with degraded roadless area characteristics due to the proximity to a major recreational

development."  Although providing this newly proffered basis for removing this parcel from the

roadless inventory, the Service asserted that "all other comments, questions and concerns regarding the 2012 Colorado Roadless Rule with respect to this analysis are beyond the scope of this analysis and the decision space for this EA."

56.     In its final decision, the agency did not provide a site-specific analysis of the impacts of egress trail construction and operation on the parcel's roadless or wilderness characteristics as required by NEPA and the Service's Appeal Deciding Officer's ruling on Plaintiffs' 2006 administrative appeal of the original egress trail authorization.  To the contrary, the 2013 decision reauthorizing the egress trail merely asserted that there would be no impacts to roadless qualities or potential wilderness because "[n]o part of the proposed trail segment is within the Burnt Mountain Colorado Roadless Area."

### F.     Plaintiffs' Administrative Appeal and Conflict of Interest Letter

57.     On November 12, 2013, Plaintiffs administratively appealed the Service's September 27, 2013 final decision reauthorizing the Burnt Mountain egress trail.  The 65-page appeal raised many issues concerning the Service's failure to analyze, at the site-specific level, whether the CRR's basis for exclusion of this parcel from the agency's roadless inventory is applicable in light of the parcel's continued unroaded and natural condition, or the impacts of egress trail construction and operation on this parcel's roadless and wilderness characteristics. Plaintiffs also relied on their previously submitted evidence demonstrating that "this parcel is still roadless and is separated from the Snowmass Ski Area in such a way that any auditory, visual, or other disturbances from the ski area are not noticeable on the 80-acre parcel where egress trail construction is planned," which the Service had refused to even consider in rendering its decision.  The appeal also argued that the bases proffered by the Service for removing this parcel from the roadless inventory – as applied by the Service in rendering its egress trail

decision – were arbitrary and capricious because they were contrary to longstanding Service

roadless management and the agency's own roadless and potential wilderness criteria found at

FSH 1909.12, 70, and thus the Service had relied on non-relevant factors in removing this parcel

from the Burnt Mountain IRA and authorizing environmentally destructive activities there.

Finally, the appeal explained that the Service violated NEPA in various ways, including by

failing to prepare an EIS despite the fact that egress trail construction and operation may

fundamentally change the character of the parcel.

58.     On December 24, 2013, the Service's Deputy Regional Forester Maribeth

Gustafson, serving as the Appeal Deciding Officer – i.e., the same Service official who had

initially authorized the same egress trail construction in this parcel in 2006 before being reversed

by a superior – denied Plaintiffs' appeal in full.  Regional Forester Gustafson relied on and

affirmed a recommendation from the Appeal Reviewing Officer that repeatedly asserted that

"Appellants' challenge to the CRR is beyond the scope of this appeal," but never grappled with

Plaintiffs' challenges to the Service's site-specific application of the CRR in its egress trail

decision or Plaintiffs' challenges to the new rationale proffered for the first time in the egress

trail decisionmaking process purportedly justifying removal of this parcel (and other similarly

situated parcels) from the roadless inventory.

59.     On January 28, 2014, Plaintiffs sent the Service a letter requesting formal

reconsideration of their administrative appeal due to the conflict of interest inherent in Ms.

Gustafson's final disposition of Plaintiffs' administrative appeal in light of Ms. Gustafson's

previous authorization of egress trail construction in the same parcel in 2006 before that decision

was reversed.  Plaintiffs explained that, among other public policy reasons, reconsideration was

required by the agency's own regulations because of Ms. Gustafson's intimate connection to the

decision at hand.  *See* 36 C.F.R. § 215.19(a)(1) (requiring that those involved in Service appeal dispositions must be individuals "who ha[ve] *not participated in the initial decision* and will not be responsible for implementation of the initial decision after the appeal is decided") (emphasis added).

60.     On February 27, 2014, the Service's Deputy Chief Leslie Weldon sent Plaintiffs' counsel a letter denying Plaintiffs' request for reconsideration of their administrative appeal, asserting that "[t]he appeal decision was properly rendered in accordance with applicable laws and regulations."

<u>**PLAINTIFFS' CLAIMS FOR RELIEF**</u>

**Claim 1 – The Service's Application of the CRR to the Egress Trail Decision**
<u>**Is Arbitrary, Capricious, and Contrary to Law**</u>

61.     While the landscape-level CRR generally assumed that all 8,260 IRA acres removed from the Service's roadless inventory had "roadless area characteristics" that were so "degraded  . . . due to the proximity to a major recreational development" that those parcels required removal from the roadless inventory, 77 Fed. Reg. at 39578, nowhere in the CRR or the Service's site-specific egress trail decision has the Service determined, as a factual matter, that this particular parcel is in fact so degraded by its proximity to the Snowmass ski resort that it no longer satisfies the agency's roadless and potential wilderness criteria at FSH 1909.12, 70 – the same criteria which the Service deemed the parcel satisfied in 1997 and 2002 when the parcel was just as proximate to the Snowmass ski resort as it is today.  Additionally, because the egress trail decision and underlying record demonstrate that this parcel, as a factual matter, continues to remain unroaded and in a natural condition, the Service acted arbitrarily, capriciously, and contrary to law both by removing this parcel from the roadless inventory and authorizing egress trail construction and operation, without determining that this parcel in fact consists of roadless

area characteristics based on "local knowledge and judgment regarding unique, site-specific conditions," as required by FSH 1909.12,71.

62.     Although the Service's landscape-level CRR asserted that this parcel's roadless characteristics were "degraded" to the point of justifying removal from the roadless inventory on the basis of its proximity to the Snowmass ski resort, which has numerous clearcut ski trails, ski lifts, access roads, and buildings, the Service has not adequately explained how other parcels in the Burnt Mountain CRA remain in the roadless inventory – after promulgation of the CRR – despite the fact that they are more proximate to the Snowmass ski resort than the 80-acre parcel removed by the CRR paving the way for egress trail construction and operation.  Thus, by relying on a "proximity" criterion that is not found in the Wilderness Act or FSH 1909.12, 70, and applying it in an inconsistent manner without adequate explanation in authorizing egress trail construction, the Service acted arbitrarily, capriciously, and contrary to law.

63.     By asserting in the egress trail decision that the agency in the CRR removed this 80-parcel from the Burnt Mountain IRA to account for "the social and economic importance of ski areas," the Service has proffered a rationale not articulated and/or adequately explained in the CRR itself, and in any event has provided a rationale purportedly justifying removal of parcels from the agency's roadless inventory which finds no support in the agency's own roadless and potential wilderness criteria at FSH 1909.12, 70 or the Wilderness Act.  At the same time, by deviating from the agency's own longstanding management regime whereby all roadless management decisions are objective determinations concerning the factual condition of a parcel made pursuant to the agency's roadless and potential wilderness criteria at FSH 1909.12, 70, which derives from the Wilderness Act, the agency has significantly changed its management course by asserting for the first time that it may make roadless decisions based entirely on

economic and social implications, without providing any coherent and legally adequate rationale supporting this deviation from prior management actions or from the rationale proffered in the CRR itself.  Accordingly, the Service acted arbitrarily, capriciously, and contrary to law by removing this parcel from the roadless inventory and authorizing egress trail construction and operation.

64.     The Service also failed in its egress trail decision – or the CRR that the egress trail decision implements – to explain how removing this 80-acre parcel from the Burnt Mountain IRA is consistent with the Service's own May 13, 2005 rule governing State-level roadless petitions.  In that rule, the Service made clear that State-level modifications to the RACR were strictly to "conserv[e] roadless area values and characteristics; protect[] human health and safety; reduc[e] hazardous fuels and restor[e] essential wildlife habitats . . . [or make] technical corrections to existing maps such as boundary adjustments to remove existing roaded areas," as required by Service regulation.  36 C.F.R. § 294.14(a)(3).  With respect to the Burnt Mountain IRA, the Service removed from the roadless inventory an 80-acre parcel that the Service itself previously determined satisfied the agency's own roadless criteria simply because it fell within a ski area special use permit boundary – without making any showing that this parcel is in fact roaded, contains hazardous fuels, or otherwise must be removed to address the concerns identified at 36 C.F.R. § 294.14(a)(3).  Accordingly, by removing this parcel from the roadless inventory and authorizing ground-disturbing activities (egress trail construction and operation) in a manner which is inconsistent with the agency's own rule governing modifications to the RACR because the parcel does not satisfy the limited criteria for roadless inventory removal, the Service acted arbitrarily, capriciously, and contrary to law.

65.     For all of the reasons set forth in paragraphs 61-64, the Service's egress trail decision – in conjunction with the CRR's ski area special use permit exclusion that the egress trail decision seeks to apply to this parcel – is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of 5 U.S.C. § 706(2).  Plaintiffs are harmed by this violation in the ways described in paragraphs 6-8.

### Claim 2 – The Service Violated NEPA in Issuing the Egress Trail Decision

66.     By failing to invite Plaintiffs' participation in the CRR when the Service knew that the agency was considering in the CRR permanently removing the 80-acre parcel from the roadless inventory – a parcel in which Plaintiffs had recently submitted extensive comments concerning the Service's 2006 egress trail decision and won their administrative appeal halting egress trail construction pending a site-specific analysis of the impact of egress trail construction and operation on the parcel's loss of roadless and wilderness characteristics – the Service violated NEPA and its implementing regulations, *see* 40 C.F.R. §§ 1501.7(a)(1) & 1506.6(b), and acted contrary to the agency's own May 13, 2005 rule and preamble, which required that the Service would use "mailing lists" to "provide notice to interested individuals, whether local or not."  70 Fed. Reg. at 25658.

67.     By failing to prepare an EIS in rendering its egress trail decision, and instead relying on an EA and FONSI, where the parcel at issue – as a factual matter – consists of unroaded and natural characteristics satisfying the agency's own roadless and potential wilderness criteria set forth in FSH 1909.12, 70 regardless of any administrative label used by the agency in reference to the parcel, and where the action is likely to permanently alter the character of the parcel, the Service violated NEPA and its implementing regulations.

68.     By failing to prepare an EIS in rendering its egress trail decision, and instead relying on an EA and FONSI, despite the fact that the egress trail decision triggered several "significance" factors found at 40 C.F.R. § 1508.27(b) – including because the action will affect unique characteristics of the local area, the action is controversial, the action establishes a precedent for authorizing site-specific activities in IRA parcels removed from the roadless inventory by the CRR, the action is related to other actions with cumulatively significant impacts, the action will affect federally protected species, and the action threatens various federal, state, or local laws – the Service violated NEPA and its implementing regulations.

69.     By failing to undertake any site-specific analysis in the egress trail decision (or otherwise) of the potential loss of roadless characteristics of this parcel – and the associated potential loss of wilderness eligibility in light of the adjacent Maroon Bells-Snowmass Wilderness Area – vis-à-vis the agency's roadless and potential wilderness criteria at FSH 1909.12, 70, the Service violated NEPA and its implementing regulations.  Particularly since Plaintiffs won their administrative appeal in 2006 which entitled them, at minimum, to a site-specific evaluation of the impacts of egress trail construction and operation on this parcel's roadless characteristics before any construction begins, it is especially egregious that the Service has yet to undertake that site-specific analysis consistent with the 2006 administrative appeal.

70.     For all of the reasons set forth in paragraphs 66-69, the Service's egress trail decision is in violation of NEPA, its implementing regulations, and the APA, and is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of 5 U.S.C. § 706(2).  Plaintiffs are harmed by this violation in the ways described in paragraphs 6-8.

### Claim 3 – The Service's CRR Ski Area Special Use Permit Exclusion from the Roadless Inventory Is Arbitrary, Capricious, and Contrary to Law

71.     By removing 8,260 IRA acres from the roadless inventory in the landscape-level CRR – including the 80-acre parcel from the Burnt Mountain IRA – based on a generalized assumption that all 8,260 IRA acres consist of degraded roadless characteristics merely due to their proximity to an operational ski area, without any subsequent site-specific opportunity for the public to demonstrate that the proffered assumption is not applicable to a particular parcel before any ground-disturbing activities are authorized, the Service exceeded its statutory authority and acted arbitrarily, capriciously, and contrary to law in basing its ski area special use permit exclusion on criteria not authorized by the Wilderness Act, any other governing statute, or FSH 1909.12, 70.

72.     To the extent that the Service, in issuing the landscape-level CRR, purported to remove 8,260 IRA acres from the roadless inventory – including 80 acres from the Burnt Mountain IRA – on the basis of economic and commercial rationales, the Service has relied on unlawful and non-relevant factors not based in the Wilderness Act, any other governing statute, or the agency's own roadless and potential wilderness criteria at FSH 1909.12, 70.   At the same time, by significantly departing from the agency's own longstanding management regime whereby all roadless management decisions are objective factual determinations made pursuant to the agency's roadless and potential wilderness criteria at FSH 1909.12, 70, the agency has significantly reinterpreted its statutory authority under the Wilderness Act without providing any coherent and legally adequate rationale supporting that substantial deviation from past practice. Accordingly, in issuing the CRR, the Service exceeded its statutory authority and acted arbitrarily, capriciously, and contrary to law in removing the 8,260 IRA acres from the roadless inventory.

73.     The Service also failed to explain in its CRR  how removing 8,260 IRA acres from the roadless inventory – including the 80-acre parcel formerly within the Burnt Mountain IRA – is consistent with the Service's own May 13, 2005 rule governing State-level roadless petitions.  In that rule, the Service made clear that State-level modifications to the RACR were strictly limited to "conserving roadless area values and characteristics; protecting human health and safety; reducing hazardous fuels and restoring essential wildlife habitats . . . [or making] technical corrections to existing maps such as boundary adjustments to remove existing roaded areas," as required by Service regulation.  36 C.F.R. § 294.14(a)(3).  However, in the CRR the Service purportedly removed parcels from the roadless inventory and associated maps simply because they fell within ski area special use permit boundaries – without making any showing that these parcels must be removed from the inventory because they are in fact roaded, contain hazardous fuels, or their removal is otherwise required to address the concerns identified at 36 C.F.R. § 294.14(a)(3).  Accordingly, by removing 8,260 IRA acres from the roadless inventory in a manner which is inconsistent with the agency's own regulation governing modifications to the RACR, as well as the Wilderness Act and other governing laws, the Service exceeded its statutory authority and acted arbitrarily, capriciously, and contrary to law in issuing the CRR's ski area special use permit exclusion.

74.     For all of the reasons set forth in paragraphs 71-73, the Service's CRR ski area special use permit exclusion is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of 5 U.S.C. § 706(2).  Plaintiffs are harmed by this violation in the ways described in paragraphs 6-8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

1.      Declaring that Defendants have violated the National Environmental Policy Act and the Administrative Procedure Act in making the egress trail decision and in adopting the ski area special use permit exclusion from the CRR;

2.      Setting aside Defendants' egress trail decision, and remanding the decision for further consideration by the agency;

3.      Setting aside Defendants' CRR ski area special use permit exclusion with respect to the 80-acre parcel and the 8,180 acres of similarly situated parcels, and remanding that portion of the CRR to the agency for further consideration;

4.      Enjoining Defendants from taking any further actions to implement the egress trail decision until the agency has fully complied with all applicable laws on remand;

5.      Awarding Plaintiffs their attorneys' fees and costs in this action; and

6.      Granting Plaintiffs any further relief as the Court may deem just and proper.


                                        Respectfully submitted,

                                        _____
                                        William S. Eubanks II (D.C. Bar No. 987036)

                                        _____/s/_____
                                        Eric R. Glitzenstein (D.C. Bar No. 358287)

                                        Meyer Glitzenstein & Crystal
                                        1601 Connecticut Ave., N.W., Suite 700
                                        Washington, D.C. 20009
                                        (202) 588-5206 / (202) 588-5049 (fax)
                                        beubanks@meyerglitz.com
April 16, 2014                          eglitzenstein@meyerglitz.com


39