# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ARK INITIATIVE, *et al.*,

    Plaintiffs,

       v.

THOMAS TIDWELL, Chief, United States
Forest Service, *et al.*,

    Defendants,

    and

ASPEN SKIING COMPANY,

    Intervenor-Defendant.

Civil Action No. 14-633 (JEB)

## MEMORANDUM OPINION

The modern administrative state reaches just about everywhere.  Even, as this case demonstrates, into the wilds of the Colorado Rockies.

Federal rules create two special classes of protection for the national forests: "wilderness areas" and "roadless areas."  Designating a parcel "roadless" makes it harder to cut down trees there; "wilderness" makes it harder still.  This case involves a decision by the United States Forest Service to remove the "roadless" designation from approximately 8,300 acres of land in Colorado that fall inside the boundaries of permitted ski areas.   Having removed that classification, the Service then authorized Aspen Skiing Company to fell trees on approximately 80 acres of that formerly "roadless" land in order to build a new ski trail.

Plaintiffs – two environmental groups and two individuals – filed suit to challenge both the removal of the "roadless" designation from the 8,300 acres and the approval of the 80-acre

construction project. They claim that the Service's actions contravened the Administrative

Procedure Act, the Wilderness Act, and the National Environmental Policy Act. Defendants –

joined by Aspen as an Intervenor – contend that Plaintiffs lack standing to bring such challenge

and that the agency violated no law. The parties have now cross-moved for summary judgment.

The Court concludes that Plaintiffs do have standing to bring this case, but that their

claims are fatally flawed on the merits. Although Plaintiffs offer several worthy challenges to

the Service's actions, in the end, the agency made its decision in accordance with the law and

following a multi-year, comprehensive, public process. Plaintiffs may have good policy

arguments against removing environmental protections from the land in question or approving

Aspen's ski trail, but this Court cannot overturn the Service's decisions unless they were

unlawful. As they were not, the Court will grant Defendants' and Intervenor's Motions and

dismiss this case.

## I.     Background

### A.  The Law of the Wild

Congress passed the Wilderness Act in 1964, Pub. L. No. 88-577, 78 Stat. 890 (1964)

(codified at 16 U.S.C. §§ 1131-1136), directing the Forest Service within the next ten years to

review whether certain areas in the National Forest System were suitable "for preservation as

wilderness." 16 U.S.C. § 1132(b). The Service was to report those findings to the President,

who, in turn, would advise Congress on his recommendations on which regions should be

officially designated "wilderness areas." See id., § 1132(a)-(b). The Act defines "wilderness"

as:

> [A]n area of undeveloped Federal land retaining its primeval
> character and influence, without permanent improvements or
> human habitation, which is protected and managed so as to
> preserve its natural conditions and which (1) generally appears to

> have been affected primarily by the forces of nature, with the
> imprint of man's work substantially unnoticeable; (2) has
> outstanding opportunities for solitude or a primitive and
> unconfined type of recreation; (3) has at least five thousand acres
> of land or is of sufficient size as to make practicable its
> preservation and use in an unimpaired condition; and (4) may also
> contain ecological, geological, or other features of scientific,
> educational, scenic, or historical value.

Id., § 1131(c).  Only Congress has the power to designate a wilderness area.  See id., § 1131(a);

Wyoming v. Dept. of Agric., 661 F.3d 1209, 1221 (10th Cir. 2011).  The moniker confers special

legal protections on the land in order to ensure that such places remain, as the Act poetically

describes, "area[s] where the earth and its community of life are untrammeled by man, where

man himself is a visitor who does not remain."  16 U.S.C. §§ 1131(c) & 1133.

On the Service's second attempt to follow through with the Wilderness Act's command,

an undertaking known as the "Roadless Area Review and Evaluation project" (RARE II), it

finally completed the inventory in 1979, describing the 62 million acres of prospective

wilderness regions it had identified as "roadless areas."  Wyoming, 661 F.3d at 1221-22; CRR-

023380.[1]  Based on the Service's report and the President's recommendations, Congress

ultimately designated a total of 35 million acres of such land as wilderness, see Wyoming, 661

F.3d at 1222, including approximately 1.4 million acres in Colorado.  See Colorado Wilderness

Act, Pub. L. No. 96-560, § 102, 94 Stat. 3265, 3265-68 (1980).

Around the same time, in 1976, Congress passed the National Forest Management Act,

Pub. L. No. 94-588, 90 Stat. 2949 (codified as amended in scattered sections of 16 U.S.C.),

which instructs the Forest Service to create and continuously update "land and resource

management plans" – also known as "Forest Plans" – for each unit of the National Forest

---

[1] Because there are two agency decisions at issue in this case – the promulgation of the Colorado Rule and the approval of the Egress-Trail Project – there are two administrative records.  The record for the Colorado Rule is denoted with the citation "CRR," and the record for the Egress-Trail Project is denoted "BME."

System.  16 U.S.C. § 1604(a).  Per the Service's own regulations, part of the Forest Plan development process includes an evaluation of a unit's suitability as a wilderness or roadless area.  See CRR-008859; 36 C.F.R. § 219.27(b) (2001); 36 C.F.R. § 219.17(a) (1982).

Particularly relevant to this case is the Service's 1997-2002 evaluation of the White River National Forest in Colorado.  There, the Service identified "90 roadless areas . . . totaling 640,000 acres."  BME-04668.  "Of these 90 areas, 37 (totaling approximately 298,000 acres) were found capable and available for recommended wilderness.  The remaining 53 areas were identified as roadless but lacking sufficient wilderness characteristics."  Id.  As part of this evaluation, the Service determined that a 1,700-acre parcel of land within White River known as "Burnt Mountain," which included the 80 acres of land inside the Snowmass ski-permit area that is the subject of Plaintiffs' Complaint, was "roadless" but not suitable for designation as "wilderness."  See BME-01041, 04225-26, 04633.

B.  Roadless Rules

After Congress reviewed the Forest Service's RARE II report and designated certain regions as "wilderness areas," the agency was left with a large inventory of "roadless areas" that, while not officially designated "wilderness," were still "worthy of some level of protection." Wyoming, 661 F.3d at 1222.  For the first several years, then, the Service managed roadless lands on a site-specific, individual basis, see BME-04666, forbidding industrial development in some areas, while allowing it in others.  See Wyoming, 661 F.3d at 1222; Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1105 (9th Cir. 2002), abrogated in part on other grounds by, Wilderness Society v. Forest Service, 630 F.3d 1173, 1180 (9th Cir. 2011).

In 2001, however, the Service decided to take a broader, national approach to the management of its roadless inventory.  It thus promulgated a "Roadless Area Conservation

Rule," which sought "to provide, within the context of multiple-use management, lasting protection for inventoried roadless areas within the National Forest System." 66 Fed. Reg. 3,244, 3,272 (Jan. 12, 2001). The Rule prohibited, with a few exceptions, road construction and timber removal on approximately 58.5 million acres of roadless areas across the country "identified in a set of inventoried roadless area maps." Id. at 3,244; see also id. at 3,272-73; BME-04667. "These nationally-applied prohibitions superceded [*sic*] the management prescriptions for roadless areas applied through the development of individual forest plans." CRR-023382.

The maps of the 58.5 million acres subject to the Roadless Rule were based on the Service's 1979 RARE II inventory of prospective wilderness areas – *i.e.,* the leftover land that Congress had not designated as wilderness – along with some regions that the Service had subsequently designated as roadless as part of its Forest Plan development process. See 66 Fed. Reg. at 3,246. The Service made clear that although the Rule was intended to conserve roadless areas, it would not afford the same protection as a "wilderness" designation: "The Roadless Area Conservation rule, unlike the establishment of wilderness areas, will allow a multitude of activities including motorized uses, grazing, and oil and gas development." Id. at 3,249. In effect, this created three levels of protection for land in the National Forest System. "Wilderness" receives the most protection, "roadless" the second most, and land with no designation the least. Cf. Ark Initiative v. Tidwell, 895 F. Supp. 2d 230, 240 (D.D.C. 2012) ("'Roadless area' . . . is a heightened designation, presumably meaning that cutting trees in a national forest is easier than cutting trees in a roadless area."), aff'd, 749 F.3d 1071 (D.C. Cir. 2014).

The Roadless Rule quickly became a target for litigation. See BME-04667; Wyoming, 661 F.3d at 1226. In 2005, the Forest Service decided to change tacks and adopt a more federalist approach to roadless-area management. It promulgated a "State Petitions Rule," which invited state governors to petition for state-specific regulations that would govern the roadless areas within their jurisdictions. See 70 Fed. Reg. 25,654, 25,654 (May 13, 2005); id. at 25,661. The Governor of Colorado took the Forest Service up on that invitation, and after a six-year rulemaking process, see Ark Initiative, 895 F. Supp. 2d at 234, the agency in 2012 finally promulgated a special roadless-area management rule specifically for the Rocky Mountain State: the "Colorado Roadless Areas Rule." See 77 Fed. Reg. 39,576, 39,577 (July 3, 2012).[2]

Graced with some of this continent's most impressive mountain ranges, Colorado is, not coincidentally, also home to some of the nation's most sought-after ski terrain. In fact, front and center in this dispute is the Colorado Rule's so-called "Ski Area Exclusion." The Forest Service's 2001 Roadless Rule had previously classified as "roadless" approximately 8,300 acres of land in Colorado that had also been allocated to ski-area special uses. See 77 Fed. Reg. at 39,578; CRR-008863, 008897, 009654. Acquiescing in the requests of three successive Colorado Governors, see CRR-00863, 00897, 009654, the Colorado Rule removed the roadless classification from those 8,300 acres. See 77 Fed. Reg. at 39,578. "In other words, if a previous roadless area lay in a permitted ski area, its roadless designation was removed." Ark Initiative, 895 F. Supp. 2d at 235. This included the 80 acres of land in Snowmass at issue in this case. See BME-04631, 04673.

---

[2] Although the Ninth Circuit subsequently struck down the State Petitions Rule and reinstated the 2001 Roadless Rule, see California ex rel. Lockyer v. Dept. of Agric., 575 F.3d 999, 1020-21 (9th Cir. 2009), Colorado submitted its petition pursuant to both the State Petitions Rule and § 553(e) of the APA. See CRR-008884. Accordingly, despite the fact that the State Petitions Rule was struck down, Colorado remains subject to the state-specific rules promulgated in response to its petition under § 553(e). Aside from Idaho, roadless areas in all other states are currently governed by the 2001 Roadless Rule. See BME-04667.

The instant lawsuit involves a challenge to the legality of the Ski-Area Exclusion. Plaintiffs are concerned because, by removing the "roadless" designation from forests that fall within ski-area boundaries, the Service made it easier for companies like Aspen Skiing to cut down those trees. See Ark Initiative, 895 F. Supp. 2d at 240.

C. The Burnt Mountain Skier-Egress-Trail Project

In 2003, nine years before the issuance of the Colorado Rule, Aspen Skiing asked the Forest Service for permission to construct the "Burnt Mountain Skier Egress Trail" in the Snowmass Mountain Ski Area. See BME-00001. Aspen hoped that the Egress Trail would improve safety and convenience for skiers cruising in the "Burnt Mountain Glades," see BME-04635, a set of ski trails in Snowmass that was the subject of prior litigation before this Court. See id.; Ark Initiative, 895 F. Supp. 2d at 235-36. This would require timber removal (cutting down trees) and construction in Burnt Mountain, which, at the time, was a 1,600-acre designated roadless area. The trees stand on 80 acres of Burnt Mountain that lie within the Snowmass boundaries, where the Trail would be located. See BME-00001, 04225, 04673; 77 Fed. Reg. at 39,611. The Forest Service authorized Aspen to construct the Egress Trail in February 2006. See BME-04818-912.

Two months later, in April 2006, two of the Plaintiffs in this case – The Ark Initiative and Donald Duerr – along with several other parties, filed an administrative appeal within the Forest Service requesting review of the agency's decision to approve the Trail. See BME-03261-458. That appeal was successful; the Service found that, because the Egress Trail fell within the Burnt Mountain roadless area, the decision to approve it required additional analysis of the "impacts" the Trail would have on the region. BME-03535. The 2006 Appeal Decision

therefore ordered the Service to prepare a new environmental assessment on the matter, before any work could begin on the project.  See id.

Seven years later, in August 2013, the Service completed that assessment.  See BME-04621-732.  Although, as the Service emphasized, see BME-04825, the 2012 Colorado Rule had in the interim removed the "roadless" designation from the 80-acre area in question – because it fell within the boundaries of the Snowmass ski-permit area – the Service nevertheless analyzed the Trail's potential impacts on the parcel's "roadless characteristics."  See BME-04665-81.  The Service concluded that even if the Egress Trail had fallen within a roadless area, it "would not affect the nine roadless area characteristics to the point of altering the characteristics of the Burnt Mountain [roadless area]."  BME-04677.  It therefore authorized Aspen to construct the Egress Trail.  See BME-04818-912.  That authorization is another subject of this litigation.

D.  The Instant Case

In April 2014, Plaintiffs filed a three-count Complaint (and two months later, an Amended Complaint) challenging both the Ski-Area Exclusion contained in the Colorado Rule and the Service's approval of the Egress-Trail Project.  Plaintiffs allege violations of the Administrative Procedure Act, the Wilderness Act, and the National Environmental Policy Act.  See Am. Compl., ¶¶ 62-74.  Plaintiffs, Defendants, and Intervenor have all cross-moved for summary judgment.  Defendants and Intervenor have further moved to strike Plaintiffs' Amended Complaint.  The briefing was completed on a somewhat expedited schedule as the tree-cutting is slated to begin imminently.

Before turning to the substance of the parties' arguments, the Court notes that Plaintiffs' briefs, and to some extent Defendants', contain a superfluity of footnotes, many of which are quite lengthy and advance substantive arguments distinct from and additional to those contained

in the body text.  In restricting the length of the parties' briefs, <u>see</u> Minute Order of June 4, 2014; Minute Order of June 26, 2014, the Court did not intend for them to simply reformat their pleadings by transferring text to single-spaced footnotes.  This practice proves both highly distracting to the reader and a transparent effort to circumvent the Court's page limitations.  The Court will therefore focus its analysis on those arguments the parties thought worthy enough to include in the main text of their pleadings.

## II.    Legal Standard

Challenges under the APA and NEPA proceed under the familiar "arbitrary and capricious" standard of review.  <u>See</u> 5 U.S.C. § 706(2)(A); <u>Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 97-98 (1983).  Although all three parties have filed Motions for Summary Judgment, the limited role federal courts play in reviewing such administrative decisions means that the typical Federal Rule 56 summary-judgment standard does not apply.  <u>See</u> <u>Sierra Club v. Mainella</u>, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006) (citing <u>Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs</u>, 2005 WL 691775, at *7 (D.D.C. 2005)).  Instead, in APA and NEPA cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did."  <u>Id.</u> (internal citations omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and otherwise consistent with the standard of review.  <u>See</u> <u>Bloch v. Powell</u>, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing <u>Richards v. INS</u>, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). Under this "narrow" standard of review – which appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) – an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). In other words, courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. Citizenship and Immigration Services, 596 F.3d 1115, 1118 (9th Cir. 2010).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003). The reviewing court "is not to substitute its judgment for that of the agency," id., nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Americans for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and citation omitted). A decision that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

## III.    Analysis

The Court will begin its analysis by addressing Defendants and Intervenor's Motion to Strike the Amended Complaint. It will then move on to their contentions concerning the Court's purported lack of jurisdiction to adjudicate this lawsuit. Finding those arguments wanting, the Court will finally take on the merits of the case.

A. Motion to Strike

The first issue the Court must resolve is the propriety of Plaintiffs' Amended Complaint. That seemingly innocuous point is particularly hard fought here because the pleading, although it does not add any new claims against Defendants, does include a new Plaintiff – the environmental group Rocky Mountain Wild – who is central to the question of Plaintiffs' standing to bring this case, a matter discussed further in the next section.

Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure allows a party to amend its complaint as a matter of course before trial within "21 days after serving it." Plaintiffs filed their original Complaint on April 16, 2014. See ECF No. 1. Apparently due to some confusion in the Clerk's Office, however, Defendants and Intervenor were not served with that pleading until June 16 and 17. See ECF Nos. 28, 30; Sur-Reply, Exh. A (Emails). Plaintiffs filed their Amended Complaint on June 5, 2014. See ECF No. 16.

The Amended Complaint was therefore filed at least eleven days before Defendants and Intervenor were ever served with the original. The practice, in such cases, appears to favor allowing amendment. See, e.g., McIntrye v. United States, No. 13-2404, 2014 WL 1653146, at *3 (M.D. Pa. Apr. 23, 2014) ("Since Plaintiff filed his Motion for Leave to File a Second Amended Complaint before Defendants were served with his original or Amended Complaint, we find that Plaintiff was not required to file a Motion for Leave to File a Second Amended Complaint."); see also Little v. E. Dist. Police Station, No. 13-1514, 2014 WL 271628, at *3 (D. Md. Jan. 22, 2014); Park v. TD Ameritrade Trust Co., No. 10-188, 2010 WL 1410563, at *1 (D. Colo. Apr. 1, 2010); Brown v. SCDC Kirland R & E, No. 10-1169, 2010 WL 3940981, at *1 (D.S.C. Oct. 5, 2010). Because there is no indication that Plaintiffs deliberately manipulated the

levers of judicial bureaucracy to engineer this result, the Court is inclined to follow that practice and permit their Amended Complaint.

Defendants and Intervenor object, however, that the Amended Complaint contravenes the parties' Joint Stipulation, approved by the Court at the very beginning of this case. <u>See</u> ECF No. 11; Minute Order, Apr. 28, 2014. There, they all agreed to set the litigation on a 97-day expedited schedule, specifying deadlines for the filing of the administrative record and cross-motions for summary judgment. <u>See</u> Joint Stipulation at 1-3. Plaintiffs filed the Amended Complaint on day 50 of that schedule and moved for summary judgment just two days later, leaving their opponents with only a few weeks to incorporate the new pleading into their cross-motions in order to meet the agreed-upon deadlines.

While this may well violate the spirit of Rule 15(a)(1)(A) and the Joint Stipulation, that agreement nowhere forbids Plaintiffs from filing an Amended Complaint. Rule 15(a)(1)(A), moreover, does not empower the Court to deny leave to amend on grounds of undue delay or prejudice – it permits amendment "as a matter of course." <u>Cf.</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (laying out grounds to deny leave to amend under Rule 15(a)(2)). The letter of the law, which favors Plaintiffs' Amended Complaint, therefore wins the day. This outcome may unfortunately require Defendants and Intervenor to be more specific in joint stipulations that they enter in the future.

B. <u>Jurisdiction</u>

Having denied the Motion to Strike Plaintiffs' Amended Complaint and deemed that document filed, thereby adding Rocky Mountain Wild as a Plaintiff to this case, the Court next moves to the question of jurisdiction. The Amended Complaint lodges three counts against Defendants: Count 1 challenges the Service's application of the Colorado Rule to its Egress-Trail

decision, see Am. Compl., ¶¶ 62-66, Count 2 claims that the Egress-Trail approval violated NEPA, see id., ¶¶ 67-71, and Count 3 advances a general attack on the legality of the Colorado Rule. See id., ¶¶ 72-74. Defendants move to dismiss Counts 1 and 3 of the Complaint – the so-called "as-applied" and "facial" challenges to the Colorado Rule – because, they say, none of the Plaintiffs has standing to pursue either of those claims. Defendants appear to concede that Plaintiffs do have standing to bring Count 2. See Def. Mot. at 2, 24.

The doctrine of "standing" reflects the Constitution's restriction of the power of federal courts to decide only "cases or controversies." See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990); U.S. Const. art. III, § 2, cl. 1. To have standing to bring a lawsuit in federal court, a plaintiff must establish that: (1) he has suffered a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical; (2) there is a causal relationship between his injury and the defendant's conduct; and (3) it is likely that a victory in court will redress his injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). An organizational plaintiff, such as the Ark Initiative or RMW, may have standing to sue both on its own behalf, known as "organizational standing," and also on its members' behalf, which is called "representational standing." See Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132 (D.C. Cir. 2006).

Having considered the arguments, the Court concludes that, at the very least, Plaintiff RMW has standing to bring both Count 1 and Count 3. Since "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," the Court need "not determine whether the other plaintiffs have standing." Rumsfeld v. Forum for Acad. & Inst. Rights, 547 U.S. 47, 52 n.2 (2006); Bowsher v. Synar, 478 U.S. 714, 721 (1986).

1.  *Count 1: "As-Applied" Challenge*

Defendants first claim that RMW lacks standing to challenge the Service's application of the Colorado Rule in the context of its approval of the Burnt Mountain Egress Trail. They rest this argument on three grounds. First, RMW has not suffered a concrete injury as a result of the Egress Trail. Second, RMW failed either to submit a comment on the Egress-Trail Project or to identify any specific concerns with the Burnt Mountain parcel when it submitted comments on the Colorado Rule. And third, RMW failed to exhaust its administrative remedies. The Court will address each point in turn.

a.  Injury-in-Fact

According to Defendants, the injury RMW will allegedly suffer as a result of the Egress Trail is insufficiently concrete to satisfy the requirements of Article III standing. RMW has claimed "representational standing" to challenge the Trail, submitting two declarations from its staff attorney and member, Matthew Sandler, describing the harm he will suffer if the project is completed. See Pl. Mot., Exh. C (Declaration of Matthew Sandler); see also Pl. Opp., Exh. E (Supplemental Declaration of Matthew Sandler).

In the Declaration, Sandler explains:

> As a RMW member, I personally and professionally value and visit wilderness-quality lands and roadless areas in Colorado. Among other roadless areas adversely affected by the CRR's ski area exclusion, I have been to the Snowmass ski resort and the area in the vicinity of Burnt Mountain and used it for recreational and other purposes. I have concrete plans to return to this area in January 2015, at which time the egress trail could be constructed absent judicial relief in this case, therefore impairing my ability to continue enjoying this area in its natural, undeveloped condition that existed prior to CRR promulgation.

Sandler Decl., ¶ 8. In his Supplemental Declaration, he offers more specifics:

> [W]hen I have visited the Snowmass ski resort, I have often hiked
> up from the main ski resort, traversed over to Burnt Mountain . . .
> and skied down Burnt Mountain in a backcountry fashion before
> traversing back over to the main ski resort and then hiking up to
> the top of Burnt Mountain again.  Although, like most skiers, I do
> not carry a GPS device when I go backcountry skiing, I can attest
> that based on my review of maps of Burnt Mountain, I am
> confident that on several occasions I skied through and otherwise
> used for recreational purposes the 80-acre parcel that the Service
> removed from the roadless inventory through the CRR.  And, as
> previously stated, I have concrete plans to return in January 2015
> to the Snowmass ski resort, and Burnt Mountain in particular
> (including the 80-acre parcel), and I will likely continue to return
> approximately once per year thereafter.  The loss of roadless
> qualities as a result of the CRR ski area exclusion in conjunction
> with egress trail construction will therefore affect my recreational
> and aesthetic interests in using this parcel for backcountry skiing
> and other purposes.

Sandler Supp. Decl., ¶ 3.

This harm confers standing on RMW.  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth v. Laidlaw Environmental Services (TOC), 528 U.S. 167, 183 (2000) (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)).  In his declarations, Sandler avers that he uses the portion of the Burnt Mountain parcel in question and that the construction of the Egress Trail will interfere with his aesthetic and recreational enjoyment of the area.  Defendants claim that Sandler's "subjective experience" of the land in question "is not sufficiently concrete." Def. Reply at 6.  Yet "aesthetic" and "recreational" values are nearly always "subjective," and the Supreme Court has affirmed that such concerns may constitute cognizable harms.  Sandler has therefore suffered an injury-in-fact, caused by the Service's approval of the Egress-Trail Project, which would be redressed if the Court reversed that decision.  That gives RMW standing to litigate on his behalf.

b. Comments

Defendants next maintain that RMW lacks standing because it never submitted a comment expressing its objections to the Egress-Trail Project. Because other commenters articulated similar concerns, however, this argument is unavailing.

The D.C. Circuit has described as "black-letter administrative law that '[a]bsent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.'" Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (quoting Tex Tin Corp. v. EPA, 935 F.2d 1321, 1323 (D.C. Cir. 1991)). This waiver rule reflects the principle that "courts should not topple over administrative decisions unless the administrative body . . . has erred against objection made at the time appropriate under its practice." Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Admin., 429 F.3d 1136, 1150 (D.C. Cir. 2005) (quoting United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37 (1952)).

Yet the Court of Appeals also quite frequently makes exceptions to this rule, permitting plaintiffs who did not participate in rulemaking processes to file challenges if, for example, other commenters raised the same concerns, see, e.g., Sierra Club v. EPA, 353 F.3d 976, 982 (D.C. Cir. 2004); Natural Res. Def. Council v. EPA, 824 F.2d 1146, 1151 (D.C. Cir. 1987), or their objections related to "key assumptions" underlying the agencies' decisions. Natural Res. Def. Council v. EPA, Nos. 98-1379, 98-1429, 98-1431, 2014 WL 2895943, at *9 (D.C. Cir. June 27, 2014). The principle animating these exceptions seems to be that, if the agency knew or should have known about the specific concerns, then the plaintiff need not have personally raised them during the comment period. Indeed, in an earlier iteration of this very case, the Court of Appeals recognized that Plaintiff Ark Initiative "did not choose to comment" on the Colorado Rule and

yet simultaneously affirmed that the group "ha[d] Article III standing" to challenge it.  Ark Initiative v. Tidwell, 749 F.3d 1071, 1073, 1079 (D.C. Cir. 2014).

Here, although RMW itself did not comment on the Egress-Trail Project, see BME-03811-04046, a number of other commenters raised the same kind of environmental and administrative concerns alleged in Count 1 of the Amended Complaint.  See, e.g., BME-03828-39, 3967-78.  The Court, consequently, finds that RMW has not waived its right to bring this challenge.

### c.  Exhaustion

Defendants last assert – in an almost cursory fashion – that RMW lacks standing because it failed to exhaust its administrative remedies with regard to the Egress-Trail Project.  While the three other Plaintiffs in this lawsuit filed an administrative appeal of the Decision Notice for the Project, RMW did not.  See Am. Compl., ¶¶ 58-61; BME-03811-4046, 04838.  Federal law requires a litigant to "exhaust all administrative appeal procedures established by the Secretary [of Agriculture] or required by law" before he may sue the Forest Service – an agency of the Department of Agriculture – or its officers.  7 U.S.C. § 6912(e)(3).

Against this charge, Plaintiffs note that several district courts have permitted plaintiffs to pursue claims against the Forest Service, even when they have not exhausted their administrative remedies, so long as another organization or a co-plaintiff did file an appeal that raised the same concerns.  In such cases, these courts have reasoned, "Since the purpose of the exhaustion requirement is to ensure that agency 'be given first shot at resolving a claimant's difficulties,' . . . the underlying rationale supporting the exhaustion requirement" has been satisfied.  Sierra Club v. Bosworth, 465 F. Supp. 2d 931, 937 (N.D. Cal. 2006); see also Conservation Congress v. Forest Serv., 555 F. Supp. 2d 1093, 1106-07 (E.D. Cal. 2008).  In this case, accordingly, the

appeal filed by the three other Plaintiffs would fulfill the exhaustion requirement for RMW. Defendants counter by citing cases holding that the exhaustion requirement is mandatory and that administrative remedies sought by other parties cannot satisfy it. See, e.g., Wildland CPR v. Forest Serv., 872 F. Supp. 2d 1064, 1073-74 (D. Mon. 2012); Chattooga River Watershed Coal v. Forest Serv., 93 F. Supp. 2d 1246, 1251 (N.D. Ga. 2000).

The Court need not weigh in on this debate. According to the D.C. Circuit, the exhaustion requirement in § 6912(e) is non-jurisdictional, meaning that a court may in certain circumstances excuse a plaintiff's failure to satisfy it, or may bypass the issue if the plaintiff ultimately loses the case on other grounds. See Munsell v. Dept. of Agric., 509 F.3d 572, 579 (D.C. Cir. 2007); see also Dawson Farms, LLC v. Farm Service Agency, 504 F.3d 592, 602-06 (5th Cir. 2007). Because, as explained below, the Court ultimately concludes that Plaintiffs' claims fail on the merits, it need not tarry over the administrative-exhaustion point. Even assuming that the appeals filed by RMW's co-plaintiffs satisfied this non-jurisdictional requirement, they still lose the case.

### 2. Count 3: "Facial" Challenge

Defendants raise three related objections to RMW's standing to bring the "facial" challenge to the validity of the Colorado Rule alleged in Count 3. First, they contend that the APA does not provide for judicial review of the Rule, independent of a challenge to a specific application of it. Second, they argue that RMW cannot use the Egress-Trail Project as a specific application of the Colorado Rule that affects its interests because it failed to comment on the Project and to exhaust its administrative remedies. Finally, they assert that RMW has suffered no injury as a result of the Rule. Because the Court's holding in the prior section resolves the third point in RMW's favor, see Part III.B.1.a, *supra*, and the second is easily dispatched, given

that RMW's co-plaintiffs commented on the Project and RMW submitted extensive comments in opposition to the Colorado Rule, see CRR-016832-71, 106963-7001, 134141-84, 134663-706, 157993-97, the Court need only address Defendants' first argument.

The APA provides for judicial review of "[a]gency action made reviewable by statue and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. As the Supreme Court has explained:

> Some statutes permit broad regulations to serve as the "agency action," and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt. Absent such a provision, however, a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him. (The major exception, of course, is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately. Such agency action is "ripe" for review at once, whether or not explicit statutory review apart from the APA is provided.)

Lujan, 497 U.S. at 891. According to Defendants, since there is no statute permitting direct judicial review of the Colorado Rule, and since the Rule standing alone does not require RMW to adjust its conduct in any way, the regulation is not independently reviewable. Defendants concede that the Colorado Rule could be reviewed in the context of a challenge to a specific application of it, such as the Egress-Trail Project, but they claim that "the action that the court [would] ultimately uphold[] or set[] aside is the site-specific decision [*i.e.,* the Trail] . . . rather than the regulation itself [*i.e.,* the Colorado Rule]." Def. Mot. at 18.

Even if RMW were barred from bringing an "independent" challenge to the Colorado Rule, it may still attack that regulation – and have it invalidated as unlawful – in the context of a challenge to one of the Rule's specific applications. The specific application in this case would

be the Egress-Trail Project, which Plaintiffs have alleged was improper <u>both</u> on its own terms <u>and</u> because the Colorado Rule on which it was based was invalid.  Plaintiffs' challenge to the Egress-Trail Project, in other words, provides the avenue through which they may attack the Colorado Rule as well.  "As the Supreme Court has made clear, such 'as applied' challenges are the appropriate means by which a party may challenge a broad agency policy document." <u>Center for Native Ecosystems v. Salazar</u>, 711 F. Supp. 2d 1267, 1273 (D. Col. 2010); <u>see also</u> <u>Ohio Forestry Ass'n v. Sierra Club</u>, 523 U.S. 726, 734-35 (1998) ("[O]ne initial site-specific victory (if based on the [underlying regulation's] unlawfulness)" can "through preclusion principles, effectively carry the day" against that rule.).

In sum, the Court concludes that RMW has standing to bring Counts 1 and 3.  Because only one plaintiff needs standing for a case to satisfy Article III, the Court need not inquire into the remaining Plaintiffs.  <u>See</u> <u>Forum</u>, 547 U.S. at 52 n.2; <u>Bowsher</u>, 478 U.S. at 721.  Defendants, moreover, as mentioned earlier, concede that Plaintiffs have standing to bring Count 2. Jurisdictional issues thus resolved, the Court may now move to the merits of the case.

C.  <u>Merits</u>

In considering the merits, the Court will proceed from the specific to the general, first analyzing the Egress Trail and then the Ski-Area Exclusion as a whole.

1.  *The Egress-Trail Project*

The Court begins with Plaintiffs' challenge to the Service's approval of the Egress-Trail Project.  According to their Motion, such approval was unlawful for two main reasons: first, because the Service failed to prepare an Environmental Impact Statement for its decision, as required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and second,

because the Environmental Assessment that the Service did prepare was insufficient.  The Court will address each contention separately.

a.   Environmental Impact Statement

"NEPA itself does not mandate particular results."  <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989).  Instead, it requires federal agencies to follow certain specified procedures before they take actions that may intrude on Mother Nature.

Most relevant to this case, NEPA requires that when an agency is considering an action that will "significantly affect[] the quality of the human environment," it must first prepare a detailed "Environmental Impact Statement" assessing the consequences of that action and any alternatives that may be available.  <u>Dept. of Transp. v. Public Citizen</u>, 541 U.S. 752, 757 (2004) (quoting 42 U.S.C. § 4332(2)(C)); <u>see also</u> <u>Sierra Club v. Peterson</u>, 717 F.2d 1409, 1412 (D.C. Cir. 1983).  When an agency is uncertain of whether an EIS is necessary, it may prepare a more concise "Environmental Assessment" to determine the "significan[ce]" of the action it is considering.  40 C.F.R. §§ 1501.4, 1508.27.  If the Environmental Assessment concludes that the proposed action will not have a "significant impact" on the environment, no EIS is necessary.  <u>Peterson</u>, 717 F.2d at 1412-13; <u>see also</u> 40 C.F.R. § 1501.4(e).  In such a case, the agency must document that conclusion in a "Finding of No Significant Impact" (FONSI).  <u>TOMAC, Taxpayers of Michigan Against Casinos v. Norton</u>, 433 F.3d 852, 857 (D.C. Cir. 2006).  The decision not to prepare an EIS may be overturned "only if it was arbitrary, capricious, or an abuse of discretion."  <u>Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson</u>, 685 F.2d 678, 681 (D.C. Cir. 1982).

In this case, the Service prepared an EA for the Egress-Trail Project and found that no EIS was necessary.  <u>See</u> BME-04621-732.  It then issued a FONSI documenting that conclusion.

See BME-04818-912.  Plaintiffs contend that that decision was flawed because, first, the Service's own regulations require an EIS for all decisions affecting a roadless area, and, second, the Project would in fact "significantly affect" the environment.

On the first point, according to Plaintiffs, Forest Service regulations require the agency to prepare an EIS before making decisions regarding a roadless area that will have a discernable impact on the area's roadless or wilderness qualities.  This proposition is not disputed: Service regulations do mandate an EIS for proposals that "would substantially alter the undeveloped character" of a designated roadless area.  36 C.F.R. §§ 220.5(a)(2), 294.45(a).  The problem for Plaintiffs, as Defendant and Intervenor are quick to point out, is that the Burnt Mountain parcel lost its "roadless" designation and was removed from the inventory as a result of the Ski-Area Exclusion in the Colorado Rule.  See BME-04673.  These regulations therefore no longer apply to the Egress-Trail Project.

Plaintiffs contend, however, that whether a parcel is officially designated "roadless" is irrelevant; so long as the land is empirically roadless, they say, an EIS is required, regardless of the administrative label.  In support of this position, they cite two Ninth Circuit decisions.  In each case, that court reviewed the sufficiency of an EIS prepared by the Forest Service to evaluate the effects of a proposed project involving, in one case, two "uninventoried roadless area[s]," Lands Council v. Martin, 529 F.3d 1219, 1230 (9th Cir. 2008), and, in the other, a "roadless area that [was] partially inventoried."  Smith v. Forest Serv., 33 F.3d 1072, 1077 (9th Cir. 1994).  Those decisions do not bind this Court, however, and they are not particularly compelling anyway.  In each case, the court simply reviewed the sufficiency of an EIS that the Service had decided to prepare for projects in undesignated roadless areas; neither decision held

that the EIS was <u>required</u>, and, in fact, <u>Smith</u> specifically stated the opposite. <u>See</u> <u>id.</u> at 1079

("[A]n EIS may not be *per se* required under such circumstances.").

Even if the Court accepted Plaintiffs' theory of the law, moreover, the Service regulations in question only require an EIS for actions that "<u>substantially</u> alter the undeveloped character" of a roadless area. 36 C.F.R. §§ 220.5(a)(2), 294.45(a) (emphasis added). The EA the Service prepared for the Egress Trail, however, concluded, after 26 pages of analysis, that the project "would not affect the nine roadless characteristics to the point of altering the characteristics of the Burnt Mountain [roadless area]." BME-04677. Given that the regulations and case law do not support Plaintiffs' claim, and that even if they did, the Service's conclusions about the effects of the Egress-Trail Project would render an EIS unnecessary, this first argument fails.

Plaintiffs' second argument for why an EIS was necessary focuses on the so-called NEPA "significance factors," set out in 40 C.F.R. § 1508.27. <u>Fund for Animals v. Norton</u>, 281 F. Supp. 2d 209, 218 (D.D.C. 2003). As mentioned earlier, under NEPA, an agency must prepare an EIS for actions that will "significantly" affect the environment, which, according to federal regulations, requires consideration of both "context" and "intensity." 40 C.F.R. § 1508.27(a) & (b). "Context" means "that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action." <u>Id.</u>, § 1508.27(a). "Intensity" means "the severity of impact," and is defined in relation to ten factors:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
> (2) The degree to which the proposed action affects public health or safety.
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

Id., § 1508.27(b).  "Some courts have found that '[t]he presence of one or more of these factors should result in an agency decision to prepare an EIS.'"  Fund for Animals, 281 F. Supp. 2d at 218 (quoting Pub. Citizen v. Dept. of Transp., 316 F.3d 1002, 1023 (9th Cir. 2003)); see also Humane Soc'y of the U.S. v. Johanns, 520 F. Supp. 2d 8, 20 (D.D.C. 2007).  Plaintiffs contend here that the Service's decision to approve the Egress Trail triggered several of the significance factors, thus necessitating an EIS.

Plaintiffs train their sights on three significance factors in particular.  First, they say the Project will affect the land's "[u]nique characteristics" and "ecologically critical areas" by degrading the parcel's roadless and wilderness qualities and fragmenting habitat used by elk, lynx, and other species.  40 C.F.R. § 1508.27(b)(3).  Second, they claim it will set a "precedent

for future actions with significant effects" because it is the first-ever site-specific application of the Colorado Rule's Ski-Area Exclusion. Id., § 1508.27(b)(6). Finally, they argue that the Project may "adversely affect an endangered or threatened species" because it will erode the habitat of the Canadian lynx. Id., § 1508.27(b)(9). Plaintiffs raised these three issues in their comments on the Project, see BME-04798-801, but, they claim, "[r]ather than seriously grapple with these concerns, the agency brushed them aside." Mot. at 48.

The administrative record, however, tells a different tale. The EA and FONSI for the Egress-Trail Project separately addressed each and every significance factor, including the three noted by Plaintiffs, and concluded that none was triggered. With respect to Plaintiffs' first point, the EA, after significant analysis, found that the Project would not alter the roadless or wilderness characteristics of the Burnt Mountain parcel. See BME-04656-81. The FONSI noted, further, that "[t]he area affected by the approved project elements does not . . . contain . . . ecologically critical areas," and that "[t]he relatively small amount of habitat loss" would not interfere with elk or lynx habitat. BME-04829-30; see also BME-04845, 04860. On the second, the FONSI observed that the Egress Trail would be the first-ever application of the Ski-Area Exclusion, but noted that "[t]he precedent was set by the [Colorado Rule], which eliminated the roadless area designation" for the land in question, and that "similar projects have occurred on NFS lands since NEPA was enacted." BME-04846. Finally, the EA examined the impact the Project would have on the Canadian lynx and found that while "there would be a loss of some lynx habitat, . . . the surrounding habitat would be capable of providing lynx movements and year-round foraging." BME-04677; see also BME-04675, 04690-92. Though Plaintiffs may disagree with these conclusions on their merits, the Court's job is to decide only whether they are

"arbitrary, capricious, or an abuse of discretion." Cabinet Mountains, 685 F.2d at 681. They are

not, which means no EIS was required.

b. Environmental Assessment

Plaintiffs are uncowed. Even if no EIS was required for the Egress Trail, they say, the

EA and FONSI the Service prepared were themselves inadequate. According to Plaintiffs,

although the EA may have analyzed the impact of the project on the 80-acre parcel where the

Trail would be constructed, it failed to consider the impact of the Project on the land adjacent to

that parcel – the region known as Burnt Mountain. Plaintiffs are particularly concerned about

increased human recreation on Burnt Mountain and the impact it may have on the area's

prospects for future designation as a "wilderness area." Defendants and Intervenor question

whether any of this analysis was necessary. Yet even if it was, the administrative record once

more belies Plaintiffs' position on this matter.

A look at the EA and the FONSI shows that the Service repeatedly considered the effect

of the Egress Trail on the adjacent Burnt Mountain area, and that it concluded that any such

impact would be minimal. See BME-04649 ("Alternative 3 would not create a significant effect

to the Roadless Area Characteristics of the adjacent Burnt Mountain [roadless area]."); 04677

("The action alternatives would not affect the nine roadless area characteristics to the point of

altering the characteristics of the Burnt Mountain [roadless area]."); 04873 ("The EA discloses

that the action alternatives would not affect the 9 Roadless area characteristics of the adjacent

[Burnt Mountain roadless area]."). The EA notes, further, that "skier visitation is not

contemplated to measurably increase overall," BME-04685; see also BME-04845, and that the

Burnt Mountain area had already been judged "not capable and not available" for wilderness

designation. BME-04855-56 (internal quotation marks omitted). Again, Plaintiffs may disagree

with these conclusions, but the only question for the Court is whether the analysis the Service used to reach them was "arbitrary, capricious, or an abuse of discretion." <u>Cabinet Mountains</u>, 685 F.2d at 681.  It was not.  The EA, as prepared, was thus sufficient to satisfy the Service's obligations under the law.

> 2. *The Colorado Rule's Ski-Area Exclusion*

Having found Plaintiffs' challenge to the specific Egress-Trail Project wanting, the Court next moves to their broader attack on the Colorado Rule's Ski-Area Exclusion.  Plaintiffs advance this assault along three tracks.  First, they claim that the Service's decision to remove the "roadless" designation from land falling within ski-area boundaries is arbitrary and capricious, in violation of NEPA.  Second, they argue that the decision contravenes substantive provisions of the Wilderness Act.  Finally, Plaintiffs complain that they were not invited to participate in the decisionmaking process for the Colorado Rule, a supposed violation of NEPA.  As before, the Court will take each of these arguments in sequence.

> a. Arbitrary and Capricious

Plaintiffs offer several reasons why the Ski-Area Exclusion in the Colorado Rule was arbitrary and capricious.  Before the Court can address those points, however, it must first deal with Defendants' surprising suggestion that such a claim is somehow "not justiciable."  Def. Mot. at 31.

> i. Justiciability

According to Defendants, "A court cannot evaluate" whether an agency action is arbitrary and capricious without "an underlying statutory obligation" against which to measure its rationale.  <u>Id.</u>  They thus deride this part of Plaintiffs' challenge as a "free-floating" or "stand-alone" APA claim, contending that because Plaintiffs have not identified a particular substantive

statute that the Service violated, their claim must be dismissed.  Id.; Def. Reply at 13.

Intervenor, it should be noted, has declined to present this defense.  That is a wise choice, since

Defendants' argument contradicts clear statutory text and repeatedly affirmed Supreme Court

and D.C. Circuit precedent.

The Court begins with basic administrative law.  Section 706(2)(A) of the APA

empowers a reviewing court to "hold unlawful and set aside agency action . . . found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A); see also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).

The Supreme Court has interpreted the "arbitrary and capricious" bit of that provision as follows:

> The scope of review under the "arbitrary and capricious" standard
> is narrow and a court is not to substitute its judgment for that of the
> agency.  Nevertheless, the agency must examine the relevant data
> and articulate a satisfactory explanation for its action including a
> rational connection between the facts found and the choice made.
> In reviewing that explanation, we must consider whether the
> decision was based on a consideration of the relevant factors and
> whether there has been a clear error of judgment.  Normally, an
> agency rule would be arbitrary and capricious if the agency has
> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)

(internal quotation marks and citations omitted).  To put it more simply, "arbitrary and

capricious" review asks whether the agency provided "a reasoned analysis" for its decision.  Id.

at 42.

Nowhere in that description is any mention of the need for the reviewing court to identify

and apply a substantive underlying statute, as Defendants claim.  That makes sense, since, as the

D.C. Circuit has explained, "Reasoned decisionmaking is not a procedural requirement . . . It

stems directly from § 706 of the APA." Butte County, Cal v. Hogen, 613 F.3d 190, 195 (D.C. Cir. 2010) (emphasis added). Indeed, since State Farm, countless courts have issued opinions analyzing whether challenged agency actions are "arbitrary and capricious in violation of the Administrative Procedure Act" without relying on anything other than the APA, the administrative record, and the relevant caselaw. See, e.g., Republican Nat. Committee v. Federal Election Com'n, 76 F.3d 400, 407 (D.C. Cir. 1996). That includes the Court of Appeals in an earlier iteration of this very case. See Ark Initiative, 749 F.3d at 1076-79.

Against all this, Defendants offer only a novel interpretation of the APA, along with a D.C. Circuit case that they have seriously misunderstood.

First, Defendants invoke § 702 of the APA, which creates a right of action for persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Defendants focus on the last piece of that phrase – "within the meaning of a relevant statute" – arguing that it "indicates that it is some other statute, not the APA, that provides a basis for the cause of action." Def. Reply at 13. Leave aside for a moment that such a reading flies in the face of established precedent. See, e.g., Md. Dep't of Human Res. v. Dep't of Health & Human Servs., 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985) ("The Supreme Court has clearly indicated that the Administrative Procedure Act itself . . . suppl[ies] a generic cause of action in favor of persons aggrieved by agency action.") (emphasis added). Defendants' interpretation is plainly mistaken, since the placement of the comma makes clear that the language in question modifies only the second half of the sentence. As the Supreme Court has explained, "[T]he party seeking review under § 702 must show that he has 'suffer[ed] legal wrong' because of the challenged agency action, or is 'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute." Lujan

v. National Wildlife Federation, 497 U.S. 871, 883 (1990) (quoting 5 U.S.C. § 702) (emphasis added).  The Court has already found that Plaintiffs have suffered a "legal wrong" as a result of the Colorado Rule, see Part III.B.1.a, *supra*, so § 702 poses no bar to their claim.  Cf. Lujan, 497 U.S. at 883.

Second, Defendants cite Trudeau v. Federal Trade Comm'n, 456 F.3d 178 (D.C. Cir. 2006), noting that the panel in that case "looked to whether the challenged agency action was 'contrary to constitutional right' or 'in excess of statutory . . . authority," but that it "did not adopt a 'State Farm framework' in analyzing the alleged generic APA claim."  Def. Reply at 13 (quoting Trudeau, 456 F.3d at 188).  It might indeed seem curious that the Trudeau court applied such a limited analysis; curious, that is, until one reads just a few paragraphs earlier in the opinion and learns that those were the only claims the plaintiff in that case actually made.  See Trudeau, 456 F.3d at 188 ("Trudeau's complaint asserts two claims against the FTC.  First, he contends that the FTC exceeded its statutory authority . . . Second, Trudeau claims that [the agency] violated his First Amendment rights.").  Of course the Trudeau court did not inquire into whether the challenged agency action was arbitrary and capricious – the challenger never contended that it was.  This argument is a loser.  Plaintiffs' claim is justiciable.

### ii. Merits

Moving on to the merits of Plaintiffs' claim, they offer four main reasons why promulgation of the Ski-Area Exclusion was arbitrary and capricious: (1) Its proffered justification was insufficient; (2) It abandoned established agency practice regarding roadless-inventory management; (3) It treated similarly situated industries differently; and (4) It created a "disjointed, contradictory nationwide roadless management system."  Pl. Mot. at 42.  None succeeds in demonstrating that the Service's decision was either arbitrary or capricious.

First, Plaintiffs claim that the Service's explanation of its decision was inadequate. Much of this argument stems from Plaintiffs' contentions that "the only reason" for the Exclusion was because the State of Colorado had requested it, <u>see</u> Pl. Opp. at 24 – an allegedly insufficient justification for such a major change – and also that the Service's "controlling, if not sole, rationale" for the Exclusion was the economic interests of the ski industry, <u>see</u> Pl. Mot. at 25 – also a purportedly inappropriate consideration. Obviously, those two points are in tension: either the Service included the Exclusion in the Colorado Rule solely at the request of the Rocky Mountain State, or it included the Exclusion solely for economic reasons, but not both. Happily for Defendants, the answer is neither. During a prior round of litigation, in fact, Ark Initiative itself recognized an additional justification the Service had offered for the Exclusion: that the 8,300 acres of land at issue "are in fact degraded and thus are no longer roadless." <u>Ark Initiative</u>, 749 F.3d at 1077.

A look at the administrative record confirms that the Service offered several different reasons, some concededly overlapping, for its decision to exclude areas within ski-area boundaries from the roadless inventory:

- Facilitating recreational use of the land, <u>see</u> 77 Fed. Reg. at 39,578 (Colorado's "22 ski areas received about 11.7 million skier visits during the 2010-2011 ski season."); CRR-153483 ("Colorado has the highest number of ski areas under permit on national forests . . . and the highest number of annual skier visits on national forests of any state.").
- Assisting Colorado's ski industry, an important source of revenue for the State, <u>see</u> 77 Fed. Reg. at 39,578 ("Colorado skiers spend about $2.6 billion annually, about one third of the annual tourist dollars spent in the State.");
- Reducing management conflicts and confusion, <u>see</u> <u>id.</u> ("The roadless area inventory for the 2001 Roadless Rule included portions of either the permit boundary and/or forest plan ski area management allocation for 13 ski areas. The final rule inventory excludes approximately 8,300 acre of permitted ski area boundaries or ski area management allocations from

CRAs. . . . This will ensure future ski area expansions within existing permit boundaries and forest plan allocations are not in conflict with desired conditions provided through the final rule."); CRR-153484 ("The settings, experience, and activities associated with developed ski areas are not always compatible with roadless area characteristics."); CRR-153486 ("The authorization of roads in developed ski areas would facilitate the implementation of required ski area vegetation management plans to improve forest health, remove hazard trees, and manage fuel hazards associated with the current mountain pine beetle epidemic affecting lodgepole pine within developed ski areas.");

- Responding to a request by the State of Colorado, see 77 Fed. Reg. at 39,578 (The Exclusion addresses "one of the State-specific concerns identified by the State of Colorado."); CRR-106429 ("The State requested that the Forest Service take this action in order to better balance the social and economic importance of ski areas with the need to protect roadless area characteristics.");

- Removing degraded areas from the roadless inventory, see 77 Fed. Reg. at 39,578 ("The final rule inventory excludes approximately 8,300 acres of permitted ski area boundaries or ski area management allocations from CRAs, which include roadless acres with degraded roadless area characteristics and due to the proximity to a major recreational development."); and

- Making only a minor impact, see id. (area removed from the roadless inventory "is less than 0.2% of the [total roadless area in Colorado]"); CRR-153148-49 ("Even though these areas are removed from the roadless inventory, site-specific NEPA would be required for potential development . . . both prior to development within permitted acres . . . and before any acres are added to a ski area permit that are not currently within the permit . . . All ski area expansion would require site-specific analysis and have to be consistent with the Forest Plan[,] both processes involve public participation.").

These diverse justifications make clear that the Service's decision was neither arbitrary nor capricious. They also vitiate Plaintiffs' related argument – that the Exclusion was not necessary to serve the agency's "only rationale" of benefiting Colorado's ski industry. Pl. Opp. at 27.

Plaintiffs' second argument is that, by promulgating the Exclusion, the Service both contravened its "Land Management Planning Handbook," see CRR-013684-728, and abandoned

past agency practice, all without recognizing or explaining this "dramatic shift in roadless management." Pl. Opp. at 28; see FCC v. Fox Television Stations, 556 U.S. 502, 515 (2009) (if agency changes policy, it must recognize the change and explain the reason for it); Town of Barnstable, Mass. v. FAA, 659 F.3d 28, 34-36 (D.C. Cir. 2011) (if agency departs from internal guidelines, it must address the departure and explain the reason for it). This argument also fails.

Start with the Handbook. The section in question, Chapter 70, "describes the process for identifying and evaluating potential wilderness in the National Forest System . . . [that is] used by the Forest Service to determine whether areas are to be recommended for wilderness designation by Congress." CRR-013698. Plaintiffs note that, according to the Handbook, the Service should identify and inventory potential wilderness areas based on the four criteria enumerated in the Wilderness Act, 16 U.S.C. § 1131(c). See CRR-013698-702. Those criteria do not include the economic factors the Service considered in adopting the Ski-Area Exclusion, and Plaintiffs, accordingly, cry foul.

Even assuming that the Service's "roadless inventory" is the same as its "potential wilderness inventory," however, this argument comes up short. The chapter of the Handbook Plaintiffs cite plainly does not apply to the task at hand: it governs an area's initial placement on the potential-wilderness inventory, but does not constrain the Service's ongoing management of that inventory. The agency's decision to recategorize a portion of its already-inventoried areas, therefore, did not contradict the Handbook.

Plaintiffs observe that the Service invoked the Handbook in a different section of the Colorado Rule, when it denied a request from the oil and gas industry to exclude from the roadless inventory areas with high potential for extractive development. See 77 Fed. Reg. at 39,588. That may well be true, but because, as the Court just explained, the Handbook does not

govern the Service's administration of its roadless inventory, the real victim here would be the oil and gas industry, not Plaintiffs.  Even if the Handbook did apply, moreover, this Court must "uphold a[n agency] decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., 419 U.S. at 286.  The Service's extensive justifications for the Ski-Area Exclusion, outlined above, are enough for the Court to discern its reasons for departing from the Handbook.

Moving next to past practice, Plaintiffs note that the Service's prior roadless inventories used objective criteria to identify qualifying roadless areas, without relying on economic considerations, and that the Service previously declined to categorically remove from its roadless inventory areas that fell within ski-area boundaries.  See CRR-01131.  Once again, however, this argument is flawed.  Even if the difference between the Colorado Rule and the Service's previous roadless-area management strategies qualified as a "chang[ed] position" that the agency would be required to recognize and give "good reasons" for, Fox, 556 U.S. at 515, the Service did just that, acknowledging that the Exclusion "adjusted roadless area boundaries from the 2001 inventory" by "[e]xcluding ski areas under permit or lands allocated in forest plans to ski area development," 77 Fed. Reg. at 39,576, and offering multiple reasons for that adjustment, as already explained.  There is no reason, then, to invalidate the Ski-Area Exclusion on these grounds.

Third, Plaintiffs contend that the Exclusion is arbitrary and capricious "because it prospectively and needlessly creates a disjointed, contradictory nationwide roadless management system, whereby inventory inclusion or exclusion is based on different eligibility factors in one state – Colorado – as compared to all other states which are managed pursuant to the [2001 Roadless Rule]."  Pl. Mot. at 42.  Plaintiffs fail to explain, however, precisely why the Court

should consider it arbitrary or capricious for the Service to manage its roadless inventory through a more federalist, decentralized process, instead of mandating a uniform standard for the entire National Forest System. Indeed, federal law seems to encourage just this kind of state-by-state approach to forest management. See, e.g., 16 U.S.C. §§ 530, 1604(a). This charge against the Ski Area Exclusion, therefore, fails as well.

Finally, Plaintiffs attack the Ski-Area Exclusion as arbitrary and capricious on the ground that the Service declined to also remove the roadless categorization from lands with high potential for oil and gas development. Plaintiffs claim that the oil and gas industry is "similarly situated" to the ski industry, Pl. Opp. at 31, and that it was thus inconsistent for the Service to recategorize roadless areas within ski-area boundaries while refusing to do the same for roadless areas with extractive promise.

This is a strange argument. The oil and gas industry differs significantly from the ski industry; indeed, the old adage about "comparing apples and oranges" does not quite seem to do the situation justice. The Court need not condescend to the reader by listing the manifold differences between a ski resort and an oil well. The Service adequately explained its decision not to recategorize roadless areas that had potential for oil and gas development, see 77 Fed. Reg. at 39,588, and any variance in treatment between the oil and gas industry and the ski industry did not require special recognition or explanation. There is, in short, nothing arbitrary or capricious here.

Wrapping up, none of Plaintiffs' arguments concerning the arbitrary and capricious nature of the Ski-Area Exclusion hits the mark. The Service provided a well-reasoned explanation for its decision to recategorize roadless areas that fell within ski-area boundaries and thereby satisfied the requirements of the APA. See State Farm, 463 U.S. at 42-43.

b.  The Wilderness Act

Plaintiffs next claim that the Ski-Area Exclusion is invalid because it violates the Wilderness Act.  Unfortunately for Plaintiffs, however, that statute simply does not apply to the Service's management of its roadless inventory.  Such an attack on the Service's decision, therefore, rings hollow.

To recap briefly, the Wilderness Act, passed in 1964, defines "wilderness" as land that meets four criteria: it appears affected primarily by the forces of nature rather than humanity, it has outstanding opportunities for solitude or unconfined recreation, it is at least five thousand acres, and it has scientific, educational, scenic, or historical value.  <u>See</u> 16 U.S.C. § 1131(c).  The Act instructs that within ten years of its enactment, the Forest Service should conduct a survey of land in the National Forest System that meets those criteria and report its findings to the President, who will then make recommendations to Congress about which areas should be officially designated "wilderness."  <u>See</u> <u>id.</u>, § 1132(b).  The Service satisfied that obligation in 1979.  <u>See</u> <u>Wyoming</u>, 661 F.3d at 1221-22.  According to Plaintiffs, the Ski-Area Exclusion violated the Wilderness Act because the Service took into account economic considerations, which are absent from the Act's four-point definition of "wilderness."  By removing land from the roadless inventory that objectively met that definition, Plaintiffs say, the Service failed to follow the procedure the Act set out for the identification of potential wilderness areas.

Merely explaining the Wilderness Act is practically enough to reveal the flaws in Plaintiffs' argument.  The Act defines "wilderness areas," not "roadless areas" – the latter, apparently, is simply a label invented by the Service to cover lands that Congress had declined to designate as the former.  <u>See</u> <u>Wyoming</u>, 661 F.3d at 1222.   The Act says nothing about how the Service should manage its inventory of such areas.  The statute's command, moreover, that the

Service should survey lands in the National Forest System for their suitability as wilderness

imposed only a single-shot, one-time obligation, which the agency fulfilled over thirty years ago.

The Wilderness Act, in short, has absolutely nothing to do with how the Forest Service manages

its roadless inventory today.  The Service, accordingly, did not identify the Wilderness Act as the

basis of its authority when it promulgated the Colorado Rule, instead citing to the Organic Act

and the Multiple-Use Sustained-Yield Act, see 77 Fed. Reg. at 39,602 (citing 16 U.S.C. §§ 472,

529, 551, 1608, 1613; 23 U.S.C. §§ 201, 205), two statutes that the Court will discuss in greater

detail further on.

Perhaps recognizing the absence of any direct connection between the Wilderness Act

and the Service's management of its roadless inventory, Plaintiffs offer a more atmospheric

argument to support their cause:

> [T]o be clear, Plaintiffs are not arguing that the [Colorado Rule]
> constituted a wilderness suitability evaluation concerning any
> specific parcel . . . Nor, for that matter, are Plaintiffs asserting that
> management of roadless areas [i]s equivalent to management [of]
> wilderness or that the Wilderness Act trumps the authorizing
> statutes.  Rather, Plaintiffs have simply made the straightforward
> argument that the roadless inventory was created in direct response
> to the Wilderness Act for the explicit purpose of helping to guide
> the implementation of the Act, and . . . the inventory still serves as
> a critical starting point in each forest plan revision process under
> NFMA for evaluating every inventoried roadless area for potential
> future wilderness designation.  On that basis, Plaintiffs have
> demonstrated that it would contravene Congress's intent in passing
> the Act if the Service could totally disregard the Wilderness Act's
> criteria in excluding unroaded, unaltered areas from the roadless
> inventory and in the process foreclose their consideration for
> wilderness suitability in future NFMA reviews.

Pl. Opp. at 35 (internal quotation marks omitted).

Plaintiffs' theory, boiled down, is that even though the Wilderness Act has no official

connection to the roadless inventory, the two have a conceptual relationship that this Court

should ratify. That, however, is not how courts decide cases. "The <u>plain meaning</u> of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." <u>Engine Mfrs. Ass'n v. EPA</u>, 88 F.3d 1075, 1088 (D.C. Cir. 1996) (emphasis added and internal quotation marks omitted). The meager legislative history Plaintiffs have dug up, which reveals some Congressional opposition to excluding from the national-wilderness inventory part of the "San Gorgonio Wild Area" in the San Bernardino National Forest in California, <u>see</u> Pl. Mot. at 33-34 (collecting sources), does not even come close to meeting that standard. The plain meaning of the Wilderness Act says nothing about the Service's management of its roadless inventory, and that meaning is what controls here.

Grasping at straws, Plaintiffs offer two alternative theories for how the Ski-Area Exclusion might contravene the Wilderness Act.

First, they invoke the 1980 Colorado Wilderness Act, in which Congress followed through on the original promise of the 1964 Wilderness Act by officially designating certain land in the State as "wilderness areas." Pub. L. No. 96-560, § 102(a), 94 Stat. 3265, 3265 (Dec. 22, 1980). Plaintiffs claim that this Act "mandated that the Service conduct wilderness suitability determinations of [roadless areas in Colorado] . . . when revising forest plans" in the State. Pl. Opp. at 37. "[B]y preemptively stripping the roadless inventory protections from 8,260 empirically unroaded acres," Plaintiffs contend, the Ski-Area Exclusion "contravenes Congress's intent" in the Colorado Wilderness Act "that parcels satisfying the [wilderness] suitability criteria, as a factual matter, . . . must be considered and analyzed by the Service for wilderness suitability." <u>Id.</u> at 37-38 (citing Pub. L. No. 96-560, § 107(b)(2), 94 Stat. at 3270-71).

A look at the provision in question, however, undermines Plaintiffs' argument. The law states only that the Service's 1979 wilderness-suitability review of national forests in Colorado "shall be deemed for the purposes of the initial land management plans required for such lands to be an adequate consideration of the suitability of such lands for inclusion [as wilderness areas], and the [Service] shall not be required to review the wilderness option <u>prior to the revision of the initial plans</u>." Pub. L. No. 96-560, § 107(b)(2), 94 Stat. at 3271 (emphasis added). Plaintiffs, presumably, read that last bit to imply that the Service <u>will</u> be required to periodically review the wilderness suitability of roadless areas in Colorado whenever it revises their Forest Plans. But the statute never actually says so. Even if the Colorado Wilderness Act did impose such a mandate on the Service, moreover, it would still have no bearing on the agency's authority to <u>remove</u> land from its roadless inventory. Plaintiffs' argument again amounts to legal hocus pocus, summoning unseen restrictions on the Service's management of its roadless inventory that lack any clear basis in the actual text of the law. The Act offers no support for Plaintiffs' case.

Second, Plaintiffs again invoke the Service's "Land Management Planning Handbook." <u>See</u> CRR-013684-728. They note that the Handbook incorporates the Wilderness Act's four-point definition of "wilderness" and that Defendants have conceded that those criteria "were utilized as a starting point for the Colorado roadless inventory." Def. Mot. at 29. Plaintiffs therefore assert that Defendants have "conced[ed] the pertinence of the Wilderness Act . . . to the [Colorado Rule]." Pl. Opp. at 39. This argument fails for two reasons, already explained by the Court. First, the Handbook, by its own terms, covers only the initial placement of land on the roadless inventory, not the Service's ongoing management of land in that inventory. Second, Plaintiffs have still failed to identify any actual connection between the Wilderness Act and the Service's administration of its roadless inventory. Defendants' admission that the Service

referred to the Wilderness Act when it crafted the Colorado Rule does not mean that the agency was legally bound by that Act. Once more, Plaintiffs come up snake eyes.

Having determined that the Wilderness Act did not restrict the Service's decision to remove from its roadless inventory lands falling within ski-area boundaries in Colorado, the question remains: Did the agency have the statutory authority to take such action? For an answer, the Court looks to the two statutes the agency cited in promulgating the Colorado Rule: the Organic Act and the Multiple-Use Sustained-Yield Act. See 77 Fed. Reg. at 39,602 (citing 16 U.S.C. §§ 472, 529, 551, 1608, 1613; 23 U.S.C. §§ 201, 205).

The Organic Act, 16 U.S.C. §§ 473-82, 551, enacted in 1897, created the predecessor to the Forest Service, authorizing the agency to "make such rules and regulations . . . as will insure the objects of [the National Forest System]" and to "regulate their occupancy and use and to preserve the forests thereon from destruction." Id., § 551. The Act thus "gives the Forest Service broad discretion to regulate the national forests." Wyoming, 661 F.3d at 1234. The Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528-31, passed in 1960, further empowered the Service to "administer the renewable surface resources of the national forests for multiple use and sustained yield," including for the purposes of "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." Id., §§ 528, 529. Congress explained that the MUSYA was "to be supplemental to, but not in derogation of," the Organic Act. Id., § 528. Like the Organic Act, the MUSYA gives the Service "broad discretion to determine the proper mix of uses permitted within" the national forests. Wyoming, 661 F.3d at 1268; see also Strickland v. Morton, 519 F.2d 467, 469 (9th Cir. 1975) (MUSYA "breathe[s] discretion at every pore").

These statutes "delegated authority to the agency generally to make rules carrying the force of law," United States v. Mead Corp., 533 U.S. 218, 226-27 (2001), thus entitling the

Service's interpretations of them to deference under <u>Chevron U.S.A. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984). As the reader is very likely aware, <u>Chevron</u> sets out a two-step test for evaluating an agency's interpretation of a statute it administers. "Under <u>Chevron</u>'s first step," the Court asks "'whether Congress has directly spoken to the precise question at issue,' for if 'the intent of Congress is clear, that is the end of the matter . . . [T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" <u>Nuclear Energy Inst. v. EPA</u>, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (quoting <u>Chevron</u>, 467 U.S. at 842-43). If, however, "the statute is 'silent or ambiguous with respect to the specific issue,'" the Court moves "to <u>Chevron</u>'s second step, asking whether the agency's interpretation 'is based on a permissible construction of the statute.'" <u>Id.</u> (quoting <u>Chevron</u>, 467 U.S. at 843).

Applying step one of <u>Chevron</u>, it is clear that neither the Organic Act nor the MUSYA addresses how the Forest Service should manage its roadless inventory, nor whether it may remove land from that inventory based in part on economic considerations. Both laws give the agency "broad discretion" to decide how best to administer the National Forest System. <u>Wyoming</u>, 661 F.3d at 1234, 1268. Moving on to step two of <u>Chevron</u>, it is also clear that the agency reasonably interpreted both laws to allow it to remove the roadless designation of lands falling within ski-area boundaries in Colorado. The MUSYA, in particular, instructs that the Service should administer the national forests "for multiple use," including for "outdoor recreation," plainly empowering the agency to take the action that it did. 16 U.S.C. §§ 528, 529. Indeed, Plaintiffs practically concede the point, never once addressing the scope of the agency's authority under the Organic Act or the MUSYA, and instead devoting their energy to chasing the

ethereal – and ultimately, irrelevant – connections between the Wilderness Act and the Colorado Rule.

Summing up, Plaintiffs' contention that the Ski-Area Exclusion violated the Wilderness Act does not prevail. The Service, moreover, was empowered to promulgate the Exclusion under both the Organic Act and the MUSYA. Plaintiffs have thus failed to present any reason for the Court to invalidate the Exclusion on these grounds.

### c. Notification

For their last assault on the Colorado Rule, Plaintiffs take issue with the Service's failure to notify them about its decisionmaking process. Federal regulations require an agency engaged in a NEPA-related rulemaking to "[i]nvite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds)." 40 C.F.R. § 1501.7(a)(1). Plaintiffs claim that their successful 2006 challenge to the Service's authorization of the Egress Trail made them "interested persons" entitled to a personal invitation to participate in the administrative process for the Colorado Rule. See 5 U.S.C. § 706(2)(D) (providing that agency action undertaken "without observance of procedure required by law" may be set aside).

The law requires no such thing. Nothing in the cited regulation demands that an agency individually notify each and every potentially "interested person" about a NEPA-related rulemaking process, and Plaintiffs have failed to identify a single case so holding. They have invoked one decision in support of their argument, Northwest Coalition for Alternatives to Pesticides v. Lyng, 844 F.2d 588 (9th Cir. 1988), but the circumstances there were a far cry from this case. In Lyng, an anti-pesticide group had obtained an injunction against an agency's use of

pesticides on the ground that the agency had not performed the required environmental analysis under NEPA.  See id. at 590.  The agency went back and did the necessary inquiry, but in so doing, it did not personally notify the anti-pesticide group that had obtained the injunction.  See id. 594.  The Ninth Circuit held that the group, "as a litigant earlier in this action," was "clearly an interested person" entitled to personal notice under § 1501.7.  Id. at 595.  It therefore concluded that the agency had violated the law, although it upheld the agency action in question because the group had not demonstrated any prejudice as a result of its lack of notice.  See id. at 595-96.

Here, by contrast, Plaintiffs' participation in the 2006 Egress Trail case involved an entirely different decisionmaking process from the Colorado Rule, and they therefore were not "litigant[s] earlier in this action" entitled to personal notice.  Id. at 595.  It is not enough, as Plaintiffs insist, that the 2006 case may have had some influence on the Service's decision to promulgate the Colorado Rule – if that were so, agencies considering new rules would be obliged to personally notify the numberless parties who could have possibly played some role in influencing federal policymaking.  No regulation would be safe from subsequent review and invalidation on such grounds.  Even if Plaintiffs were entitled to personal notice, moreover, they have failed to show – or even mention – how the lack of notice in this case prejudiced them.  See id. at 595.  This is particularly true since RMW did comment on the Colorado Rule.

As Defendants and Intervenor have documented, the Forest Service went to great lengths to involve the public – and Plaintiffs – in the decisionmaking process for the Colorado Rule. This included:

- Five formal public-involvement processes, generating a total of 312,000 public comments, 77 Fed. Reg. at 39,581; Ark, 895 F. Supp. 2d at 234;

- The creation of a bipartisan task force in Colorado, which held nine public meetings and six deliberative meetings open to the public, and received over 40,000 public comments, 77 Fed. Reg. at 39,581;
- Numerous notices published in the Federal Register, among them a notice of intent to prepare an EIS on roadless-area conservation in national forests in Colorado, a proposed rule to establish State-specific management direction for roadless areas in Colorado, a notice of availability for the draft EIS, a revised proposed rule and notice of availability for the revised draft EIS, and a notice of availability for the final EIS, see id.; and
- Three Roadless Area Conservation National Advisory Committee meetings, open to the public, in which both the Forest Service and the State of Colorado participated. See id.

The Service's impressive efforts to reach out to the public as it worked out the contours of the Colorado Rule were sufficient to satisfy its notice obligations to Plaintiffs. Their final attack on the Rule is therefore unconvincing.

## IV.    Conclusion

The Court does not intend its decision in this case to minimize the natural beauty of Colorado's mountainsides, nor the imperative of conserving them for future generations. Instead, what the Court holds here is that, as a steward of these lands, the Forest Service has ultimately arrived at a well-considered and lawful decision. As a result, the Court will issue a contemporaneous Order that will deny Defendants' and Intervenor's Motion to Strike the Amended Complaint and grant their Motions for Summary Judgment.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: August 18, 2014